Federación de Pescadores de Playa Picúas, Inc. y otros, demandantes y recurridos, *v.* U.S. Industries, Inc. y otros, demandados y peticionarios.

*Número:* CE-91-337          *Resuelto:* 14 de marzo de 1994

*Rubén T. Nigaglioni* y *Diana Méndez Ondina*, de *Ledesma, Palou & Miranda*, abogados de los peticionarios; *Carlos Vizcarrondo Irizarry*, de *Servicios Legales de Puerto Rico*, abogado de los recurridos; *Jorge E. Pérez Díaz, Procurador General*, y *Carlos Lugo Fiol, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Mediante la decisión que emitimos en el presente recurso, adoptamos, y aplicamos, en la esfera de la práctica y ejercicio de la Notaría en Puerto Rico, la norma *eximente* de responsabilidad civil del "error de juicio, honesto e informado", que consistentemente hemos aplicado en acciones, por alegada mala práctica profesional, en el campo de la medicina en nuestra jurisdicción.

I

U.S. Industries, Inc. (en adelante U.S.I.) adquirió el dominio de la finca conocida como "Las Picúas" como consecuencia de la ejecución de una hipoteca, otorgada a favor

de dicha Corporación, la cual estaba garantizada con la mencionada finca.([1]) Luego de varios esfuerzos infructuosos para desarrollar en ella un complejo residencial,([2]) U.S.I. intentó vender o permutar la finca. Entre otras gestiones, publicó anuncios de venta en periódicos locales y del exterior; ofreció la finca en venta al Fideicomiso de Conservación de Puerto Rico, y propuso al Departamento de Recursos Naturales la permuta del inmueble por otro de equivalente valor pero ubicado en una zona que se ajustara a los propósitos de la Corporación. Sus gestiones *no* tuvieron éxito.

Así las cosas —actuando conforme las disposiciones del Art. 3 del Reglamento de Lotificación (Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, ed. rev. de 1986, pág. 5) vigente en dicha fecha, y con el obvio y comprensible propósito de deshacerse de la finca— U.S.I. concibió la idea de segregar la finca rural en controversia en parcelas, de más de veinticinco (25) cuerdas, que serían dedicadas a fines agrícolas.([3]) A esos efectos, se llevó a cabo la lotificación de la finca en treinta (30) parcelas, de veinticinco (25) cuerdas o más, mediante la Escritura Pública Núm. 44, otorgada el 5 de julio de 1983 ante el notario público José A. Ledesma Vivaldi.([4])

---

([1]) U.S. Industries, Inc. (en adelante U.S.I.) advino dueña de la finca mediante la escritura de venta judicial número trece (13) de 28 de marzo de 1978, otorgada ante el notario Ramón Mellado.

([2]) El 21 de marzo de 1980 la Junta de Planificación denegó una consulta de ubicación para el desarrollo de un complejo residencial radicada a nombre de U.S.I. por el contratista Morris Demel. Entre las razones aducidas por la Junta de Planificación para la denegatoria estaban: (1) que la finca que se intentaba desarrollar estaba fuera del área delimitada por el mapa de expansión urbana del municipio de Río Grande; (2) que las facilidades de infraestructura no estaban disponibles; (3) que, a tenor con los mapas de Zonas Susceptibles a Inundaciones, parte de la finca se encontraba en un área inundable y la otra parte en un área de manglares, y (4) que el proyecto ocasionaría un impacto negativo al ambiente, tanto al área de mangle como al área costera.

([3]) Siempre que las parcelas a segregarse sean de más de veinticinco (25) cuerdas y las mismas se dediquen a fines agrícolas, el citado Art. 3 del mencionado Reglamento Núm. 3 *exime* del requisito de aprobación por la Junta de Planificación.

([4]) Ante el mismo notario Ledesma Vivaldi se otorgó, el 20 de octubre de 1983, una "escritura aclaratoria". La misma se otorgó para hacer constar, o aclarar, que las

Las referidas escrituras *fueron debidamente inscritas* en la Sección Séptima del Registro de la Propiedad de San Juan.([5]) Las treinta (30) parcelas fueron luego vendidas a distintas personas, entre ellas, al codemandado Manuel Rivera Torres.([6])

El 12 de septiembre de 1984, la Federación de Pescadores de la Playa Las Picúas, Inc. radicó demanda sobre "sentencia declaratoria e *injunction*" ante el Tribunal Superior de Puerto Rico, Sala de Carolina, contra U.S.I., el Sr. Manuel Rivera Torres y algunos de los otros compradores de parcelas en "Las Picúas". U.S.I. compareció en dicho pleito representado por el bufete Ledesma, Palou y Miranda, del cual el notario Ledesma Vivaldi es uno de sus socios. Posteriormente, se admitió la intervención, como demandantes, del Estado Libre Asociado de Puerto Rico, el Departamento de Recursos Naturales, la Junta de Planificación y otros.([7])

Luego de la celebración de una vista evidenciaria de va-

---

treinta (30) parcelas habían sido segregadas para "fines agrícolas".

([5]) Ello así surge de la pág. 8 de la Sentencia de 1ro de noviembre de 1989 emitida por el Tribunal Superior de Puerto Rico, Sala de Carolina.

([6]) El señor Rivera Torres había comprado tres (3) de las parcelas segregadas y vendidas por U.S.I. El 26 de junio de 1984, mediante escritura de compraventa Núm. 45 ante el notario José Ledesma, U.S.I. le vendió la parcela Núm. 17, con cabida de 25.1140 cuerdas, por el precio de ochenta y cinco mil dólares ($85,000). En esa misma fecha y ante el mismo notario, se constituyó hipoteca a favor de U.S.I. en garantía del pago de dicho precio. El 10 de octubre del mismo año, se otorgó la Escritura Núm. 5 ante el notario Eric Ronda. En esta ocasión se le vendió a Rivera Torres la parcela Núm. 18, con cabida de 25.2111 cuerdas, por el precio de ochenta y cinco mil dólares ($85,000). También se constituyó hipoteca a favor de U.S.I. En el mismo año 1984, el señor Rivera Torres adquirió la parcela Núm. 11, con cabida de 27.5 cuerdas. En esta ocasión la adquisición se realizó a través de un testaferro, el cual luego traspasó la parcela formalmente al codemandado Rivera Torres.

([7]) Estos codemandantes alegaron, en síntesis, que la lotificación de la finca "Las Picúas" y las posteriores escrituras de compraventa e hipoteca eran ilegales y que los codemandados estaban ocasionando daño al sistema ecológico de la zona, ello en violación de la reglamentación aplicable. También, alegaron que los codemandados estaban obstaculizando el acceso de los miembros de la Federación de Pescadores al área de pesca en la zona marítimo-terrestre de Punta Picúa. Véanse: Demanda de 12 de septiembre de 1984 y demandas de intervención radicadas por el Municipio de Río Grande, la Asamblea Municipal de Río Grande, el Departamento de Recursos Naturales, la Administración de Reglamentos y Permisos, y la Junta de Planificación.

rios días de duración,(⁸) en la que todas las partes tuvieron la oportunidad de desfilar evidencia y confrontar la prueba desfilada por las partes contrarias, el Tribunal Superior dictó sentencia en la que decretó la nulidad y total carencia de eficacia jurídica de la lotificación de la finca "Las Picúas" y de las escrituras públicas de segregación, y escritura aclaratoria, otorgadas por U.S.I. ante el notario José Ledesma Vivaldi.(⁹) La declaración de nulidad respondió a que, a juicio del Tribunal Superior, ambas escrituras habían sido otorgadas en contravención al Art. 22 de la Ley Orgánica de la Administración de Reglamentos y Permisos,(¹⁰) 23 L.P.R.A. sec. 714, y en contravención a la Sec.

---

(⁸) Por Orden Extraordinaria para el Manejo del Caso dictada el 13 de enero de 1989, el Tribunal Superior había señalado dicha vista y la había destinado exclusivamente a lo concerniente a los derechos y responsabilidades legales de los demandantes Federación de Pescadores de la Playa Las Picúas, Inc. y Estado Libre Asociado de Puerto Rico, y de los demandados U.S.I. y Manuel Rivera Torres.

(⁹) La sentencia del Tribunal Superior, en lo pertinente, lee:

"2. El Tribunal declara que, *tanto la lotificación realizada mediante la escritura número 44* otorgada en San Juan, Puerto Rico, el 5 de julio de 1983 ante el notario José. A. Ledesma Vivaldi a virtud de la cual la demandada U.S. Industries, Inc. segregó en treinta parcelas la finca de 782.73 cuerdas conocida como "Las Picúas" —la cual se describió en las Determinaciones de Hechos precedente— *como la propia escritura pública que la contiene*, son nulas y carentes de toda eficacia. ["Determinaciones de Hechos, Conclusiones de Derecho y Sentencia" dictada el 1ro de noviembre de 1989 por el Tribunal Superior, Sala de Carolina (Carmen R. Vélez Borrás, Juez), pág. 16. Véase también: "Sentencia" de 1ro de noviembre de 1989]. (Énfasis suplido.) Caso Núm. CE-91-337, Parte I, Anejo Ch, pág. 16.

En "Sentencia" separada, dictada el mismo día, se condenó solidariamente a U.S.I. y a Manuel Rivera Torres a pagar al E.L.A. la cantidad de ciento cincuenta mil dólares ($150,000) por concepto de daños ocasionados al medioambiente y al pago de cinco mil dólares ($5,000) por concepto de honorarios de abogados a cada uno de los demandantes (E.L.A. y Federación de Pescadores de la Playa Las Picúas, Inc.).

Además, el tribunal declaró que los contratos de compraventa realizados el 26 de junio y el 10 de octubre de 1984, en virtud de los cuales U.S.I. vendió al codemandado Manuel Rivera Torres las parcelas Núms. 17 y 18 de la finca "Las Picúas", así como las escrituras Núm. 45 de 26 de junio de 1984 ante el notario José A. Ledesma Vivaldi y la Núm. 5 de 10 de octubre de 1984 ante el notario Eric Ronda que los contienen eran nulos y carentes de eficacia legal.

Por último, el tribunal sentenciador declinó pasar juicio sobre la validez legal de las transacciones realizadas por los demás demandados ya que las vistas celebradas habían estado limitadas a la adjudicación de los derechos respectivos de los demandantes y de los codemandados U.S.I. y Manuel Rivera Torres.

(¹⁰) Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 *et seq.*); Art. 4 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4.

6.04 del Reglamento sobre Zonas Susceptibles a Inundaciones (Reglamento de Planificación Núm. 13, Junta de Planificación de Puerto Rico, 2da rev., Santurce, 1987), según complementado por el Mapa de Zonas Susceptibles a Inundaciones. A tenor con este último, el área en el cual ubica la finca es inundable (Zona 1).[11]

Procede que se *enfatice el hecho* que el Tribunal Superior *admitió*, en la sentencia que dictara, que las disposiciones contenidas en el Art. 3 del Reglamento de Planificación Núm. 3, *supra*, vigente a la fecha de la lotificación en cuestión, daban la impresión de que la exención, a la cual el mismo hace referencia, comprendía todas las fincas radicadas en la zona rural que se dediquen a la actividad agrícola y excedan de veinticinco (25) cuerdas, *sin importar la naturaleza inundable de las mismas*.[12] Sin embargo, el Tribunal Superior, *interpretando* ambos reglamentos de manera integral[13] y en atención a los propósitos que inspiran la planificación urbana en Puerto Rico,[14] concluyó que la exención del Reglamento Núm. 3, *supra*, es inope-

---

[11] La Sec. 6.04 del referido Reglamento Núm. 13 dispone como sigue:

"6.04 Lotificación en la Zona 1.—A partir de la fecha de vigencia del correspondiente Mapa de Zona Susceptible a Inundaciones no se permitirá la lotificación de terrenos en esta Zona." Reglamento sobre Zonas Susceptibles a Inundaciones (Reglamento de Planificación Núm. 13, Junta de Planificación de Puerto Rico, 2da rev., Santurce, 1987, pág. 41).

[12] El Reglamento Núm. 3 de Planificación vigente a la fecha de la lotificación de la finca "Las Picúas" reglamenta la lotificación de terrenos en Puerto Rico. Su Art. 4 exige que toda persona interesada en realizar una lotificación radique ante el Secretario de la Junta de Planificación una Declaración de Intención de Lotificar. *Su Art. 3 exime de dicho requisito a las lotificaciones de "fincas en la zona rural, para fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas resulte ser de veinticinco (25) cuerdas o mayor"*. (Énfasis suplido.) Reglamento de Lotificación (Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, ed. rev. 1986, pág. 5).

[13] Así lo dispone el párrafo final del prefacio del Reglamento Núm. 13, el cual reza:

"Las disposiciones de este Reglamento quedarán suplementadas por las disposiciones de cualquier otro reglamento en vigor aprobado por la Junta de Planificación que sea de aplicación para la zona específica en que ubique la propiedad." Reglamento sobre Zonas Susceptibles a Inundaciones (Reglamento de Planificación Núm. 13, Junta de Planificación de Puerto Rico, Santurce, 1972, pág. III.

[14] Véanse: *Fernández v. Registrador*, 82 D.P.R. 539 (1961); *Soto v. Feliciano*, 80 D.P.R. 615 (1958).

rante en relación con fincas localizadas en zonas declaradas inundables.([15])

Varias de las partes adversamente afectadas por esta sentencia presentaron solicitudes de revisión ante este Tribunal.([16]) En dichos recursos se cuestionó, entre otras, la determinación de nulidad tanto de la segregación de la finca "Las Picúas", en particular de las parcelas que luego fueron compradas por Manuel Rivera Torres, y que fuera realizada por U.S.I. mediante las escrituras de 5 de julio y 20 de octubre de 1983, así como la determinación de nulidad de dichas escrituras en sí y la corrección de la interpretación que hizo el Tribunal Superior de los reglamentos aplicables. Estos recursos —con la disidencia de dos (2) de sus Jueces— fueron denegados por el Tribunal Supremo,([17]) por lo que la sentencia del Tribunal Superior de 1ro de noviembre de 1989 advino final y firme y el pleito continuó su curso, ante el tribunal de instancia, en cuanto a los restantes demandados.

Luego de varios incidentes procesales, entre los cuales se destaca la inhibición de la Juez que hasta entonces había presidido los procedimientos en el caso,([18]) y la corres-

---

([15]) En adición, el foro de instancia señaló que aún de prevalecer la hipótesis de que el Reglamento Núm. 3, *supra,* tuviera que ser interpretado aisladamente, la lotificación realizada por la corporación demandada resultaría nula y carente de eficacia legal, ello en vista de que la prueba desfilada durante el juicio demostró que ni antes, ni durante, ni con posterioridad a la lotificación, la finca "Las Picúas" había sido finca agrícola. El foro de instancia dedujo tal conclusión de un estudio titulado "Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico" aprobado por el Gobernador el 22 de junio de 1977. En dicho estudio se identifica la zona donde ubica la finca "Las Picúas" como una con los suelos menos productivos de Puerto Rico.

([16]) Los codemandados Juan Amézaga, Josefina Figueroa Bocanegra e Ismael Castro Just presentaron la Petición de *certiorari* Núm. CE-89-834; la U.S.I. presentó el Recurso de revisión RE-89-703 y el señor Rivera Torres radicó el Recurso Núm. RE-89-704.

([17]) Resoluciones dictadas el 4 de enero de 1990 y el 25 de enero del mismo año.

([18]) La peticionaria U.S.I. solicitó la recusación de la Hon. Juez Carmen Rita Vélez Borrás, quien presidía sobre el caso. Luego de celebrarse vista sobre dicha solicitud, la misma fue denegada en resolución emitida el 29 de agosto de 1990 por el Hon. Juez Germán Brau, ello "en vista de su patente frivolidad". Posteriormente, por resolución emitida el 7 de septiembre de 1990, la Juez Vélez Borrás, a iniciativa propia y en el ejercicio de su discreción, se inhibió de toda ulterior participación en

pondiente asignación del mismo a otro Juez del Tribunal Superior,[19] el Estado Libre Asociado radicó una moción titulada "Moción en torno a solicitud de remedio y otros extremos". En dicha moción, el E.L.A. solicitó que el tribunal ordenara a la U.S.I. depositar judicialmente la suma de ciento cincuenta mil dólares ($150,000), más intereses, y cinco mil dólares ($5,000) por concepto de honorarios de abogado, cuyo pago le había sido ordenado por el Tribunal Superior en la sentencia de 1ro de noviembre de 1989. En adición, solicitó el Estado que se le ordenara a U.S.I. entregar copias de las escrituras de compraventa, solicitadas durante el procedimiento de descubrimiento de prueba, y que U.S.I. se había negado a entregar.

El 10 de abril de 1991, el Tribunal Superior, Sala de Carolina, emitió resolución en la que declaró con lugar la solicitud del E.L.A. a la que hemos hecho referencia y, además, le impuso a U.S.I. y/o a sus abogados el pago de las costas de una deposición que había sido pactada para el 11 de febrero de 1991 y a la cual el deponente no compareció. En adición, le impuso a U.S.I. el pago de cien dólares ($100) por concepto de honorarios de abogados a favor de las partes que comparecieron a dicho acto.

Finalmente, *y sin que ello hubiese sido solicitado por alguna de las partes*, el Tribunal ordenó la *descalificación* de los abogados de U.S.I. En apoyo de dicha determinación, adujo el foro de instancia que:

> Cabe recordar que en su sentencia del 1 de noviembre de 1989, la Hon. Juez Vélez Borrás dictaminó la nulidad de ciertas segregaciones realizadas por U.S.I. con relación a los predios en controversia en este caso. Surge de dicha sentencia, así como de los autos de este caso, que dichas segregaciones fueron realizadas a través de la escritura de segregación número 44 otorgada por U.S.I. el 5 de julio de 1983 ante el Notario Público Lcdo. José A. Ledesma. El licenciado Ledesma es abogado del bufete que representa a U.S.I. en este caso y es uno de los dos suscri-

---

los procedimientos del caso.

[19] El caso fue posteriormente asignado al Hon. Germán Brau, Juez.

bientes de la Moción de Recusación contra la Honorable Juez Vélez Borrás. *Precisamente, la validez de otras segregaciones contenidas en la escritura*, otorgada ante el licenciado Ledesma, *constituye la médula de las restantes controversias de este caso.*

Esta situación, a nuestro juicio, *crea un patente conflicto* en la representación profesional de la parte codemandada U.S.I. Está claro que de prevalecer la posición de los demandantes contra U.S.I. y declararse la nulidad de todas las segregaciones, *existe cuando menos la posibilidad de una exposición económica personal del Licenciado Ledesma y del bufete al cual éste pertenece.* Juzgamos que esta posibilidad, real o no, pudiera haber contribuido a nublar el juicio profesional de quienes de otro modo conocemos como abogados serios y responsables.

Nuestro Tribunal Supremo ha sostenido reiteradamente que es inapropiado para un abogado el combinar funciones de Notario y de abogado con relación a un mismo asunto. Véase: *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 787 (1984); *B. & L., Inc.* v. *P.R. Cast. Ste[e]l Corp.*, 114 D.P.R. 808, 810 (1983); *Pagán* v. *Rivera Burgos*, 113 D.P.R. 750, 752, n. 2 (1983). Por su parte el Canon 21 de los de Ética Profesional dispone entre otras cosas, *que ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.* La aplicación de estas autoridades a la situación de autos *sugiere que debe relevarse* a los abogados de U.S.I. de su representación profesional.[20] (Énfasis suplido.) Caso Núm. CE-91-337, Parte I, Apéndice, Anejo A, págs. 6–8.

De dicha resolución, U.S.I. recurrió ante este Tribunal, vía *certiorari,* señalando que el Tribunal Superior erró al descalificar sus abogados. Mediante Resolución, de fecha 6 de junio de 1991, le concedimos término a la parte demandante recurrida para que

... comparezca por escrito a mostrar causa, si la hubiere, por la cual no debe expedirse el auto solicitado y modificarse la Resolución del Tribunal Superior, Sala de Carolina, de fecha 10 de abril de 1991, en lo concerniente a su decreto descualificando a los abogados de la peticionaria U.S. Industries, Inc. (U.S.I.), a saber, firma jurídica Ledesma, Palou y Miranda, en el caso. Resolución de 6 de junio de 1991, pág. 1.

Dicha parte compareció. Estando en condiciones de resolver el recurso radicado, procedemos a así hacerlo.

---

[20] Resolución del Tribunal Superior de 10 de abril de 1991, págs. 6–8.

## II

De entrada, debemos señalar que el caso de autos *no* presenta la situación prohibida por este Tribunal en los casos de *Pagán v. Rivera Burgos*, 113 D.P.R. 750, 752 esc. 2 (1983), y el de *B. & L., Inc. v. P.R. Cast. Steel Corp.*, 114 D.P.R. 808, 810 (1983). La norma establecida en esos casos se limitó a prohibir que el abogado que ostenta la representación de una parte *en un litigio* pueda tomar juramento, en calidad de notario, en los documentos a utilizarse, y a ser notarizados, en el *transcurso* de dicho pleito. A esos efectos, en *Pagán v. Rivera Burgos,* supra, pág. 752 esc. 2, este Tribunal señaló que "[n]o es precisamente correcto que el propio abogado, en función de notario, tome juramento a su cliente". Más adelante en ese mismo año de 1983, en *B. & L., Inc. v. P.R. Cast. Steel Corp.*, supra, una mayoría del Tribunal intentó consignar los fundamentos y delimitar el ámbito de la antes señalada expresión, la cual sólo había sido objeto de señalamiento en un escolio en el caso de *Pagán v. Rivera Burgos,* supra. Se señaló en el citado caso de *B. & L., Inc. v. P.R. Cast. Steel Corp.*, supra, pág. 810, que "el notario es un funcionario público usualmente llamado a proteger el derecho de dos o más partes y aun el de tercero que no comparece ante él, en ejercicio de una neutralidad incompatible con la misión del abogado que es la de inclinar la balanza en activa promoción del interés de su representado". Citando a *Negrón et al. v. El Superintendente de Elecciones*, 11 D.P.R. 366, 370 (1906), este Tribunal señaló que los abogados que representan a una parte en una acción ante el tribunal no deben ejercer labores de notarios en dichos casos ya que tal "proceder da lugar [a] sospechar en cuanto a la justicia y la propiedad que debe observarse siempre en la administración de los juramentos". Íd., pág. 811.

En el presente caso *no* se les imputa a los abogados de U.S.I. haber actuado como notarios en el pleito una vez

incoado el mismo.([21]) Las actuaciones, como notarios, de los abogados de U.S.I. que dieron lugar a su descalificación, por parte del foro de instancia, ocurrieron *con anterioridad* a la radicación de la demanda en el caso. Esto es, el caso de autos *no* presenta la situación contemplada, y prohibida, en las decisiones antes mencionadas; razón por la cual no es de aplicación al mismo la norma establecida por este Tribunal en los casos de *Pagán v. Rivera Burgos*, y *B. & L., Inc. v. P.R. Cast. Steel Corp.*, antes mencionados.

Somos del criterio que *tampoco* resulta aplicable al caso de autos la decisión que este Tribunal emitiera en *In re Colón Ramery*, 133 D.P.R. 555 (1993).([22]) En dicha decisión se estableció la norma a los efectos de que el notario que autoriza una escritura, *en la que se establecen obligaciones bilaterales o contraprestaciones*, no puede posteriormente comparecer como abogado en un pleito judicial, en representación de una (1) de las partes otorgantes del documento, para exigir la contraprestación a la que se obligó la otra parte compareciente en el documento por él otorgado. En específico, allí expresamos:

> ... Un abogado-notario que reclama judicialmente en representación de una de las partes otorgantes de un documento, para exigir la contraprestación a la que se obligó la otra parte en el documento, da la falsa impresión de que siempre estuvo parcializado con la parte en representación de la cual reclama. *Ello, claro está, cuando se trata de reclamaciones de índole contenciosa.* (Énfasis suplido.) *In re Colón Ramery*, supra, pág. 567.

---

([21]) Incluso, de haber sido esta la imputación, la descalificación de todos los abogados del bufete Ledesma, Palou y Miranda estaba injustificada. En *B. & L., Inc. v. P.R. Cast. Steel Corp.*, 114 D.P.R. 808, 810 (1983), el Tribunal resolvió que la citada norma de *Pagán v. Rivera Burgos*, 113 D.P.R. 750 (1983), "se detiene en el abogado a cargo del caso, el que de hecho ejerce la representación legal del cliente, sin que necesariamente se extienda a la intervención en carácter de notario, de sus socios y compañeros de bufete en cualquier otra calidad". En el caso de autos, no todos los miembros del bufete que ostentan la representación legal de la demandada recurrente U.S.I. actuaron como notarios en las escrituras cuya validez es objeto de este litigio.

([22]) 93 J.T.S. 91.

A nuestro juicio, esta norma *no* constituye impedimento para que los notarios que autorizaron las escrituras aquí en controversia pudieran comparecer, posteriormente en el pleito judicial del epígrafe, en representación de uno de los otorgantes de las mismas, pues todas las partes otorgantes en las escrituras autorizadas por el notario Ledesma Vivaldi están en el "mismo lado" del pleito; esto es, todos son demandados. El pleito de epígrafe *no* es el pleito contencioso entre los otorgantes de un instrumento público que discrepan, *entre sí*, en cuanto a la validez, el contenido o los efectos jurídicos del documento otorgado por el notario;(²³) situación que es la contemplada en el citado caso de *In re Colón Ramery*, supra. Es de notar que el interés de la codemandada U.S.I. es similar, *por no decir igual*, al de los restantes codemandados, ya que todos los codemandados intentan sostener, y sostienen, ante el tribunal de instancia, la validez de las escrituras públicas en controversia. En fin, los otorgantes de las escrituras públicas autorizadas por el notario Ledesma Vivaldi *no* son partes antagónicas entre sí en un pleito en que se reclaman obligaciones contraídas en una escritura o documento, razón por la cual *no* aplica la norma establecida en *In re Colón Ramery*, supra.(²⁴)

---

(²³) De hecho, en la Escritura Núm. 44, de segregación, otorgada ante el notario Ledesma Vivaldi el 5 de julio de 1983, *únicamente* compareció la dueña del inmueble, esto es, U.S.I.

(²⁴) En relación con el señalamiento que hizo este Tribunal en el citado caso de *In re Colón Ramery*, 133 D.P.R. 555, 568 (1993), a los efectos de que el notario otorgante de un documento no debe participar como abogado en un pleito posterior en que dicho documento "sea el objeto de la controversia" debido al hecho de que el notario "siempre es testigo silente" en cuanto al mismo, es de notar que el tópico o asunto, en relación con el cual el notario puede ser testigo, necesariamente se refiere a la validez del documento otorgado y la actuación del notario referente a la misma.

En el presente caso *ya no existe la situación que puede causar la utilización del notario como testigo*; ello en vista del hecho de que el Tribunal Superior, Sala de Carolina, *determinó que las escrituras en controversia eran nulas*, determinación que este Tribunal confirmó al negarse a revisar la misma. *Esto es, la validez de dichas escrituras, y la actuación del notario referente a la misma, ya no están en disputa.*

# III

■ Ello no obstante, y como surge de la relación de hechos que hiciéramos, el tribunal de instancia ordenó la descalificación del mencionado bufete de abogados en vista del hecho de que, a su juicio, existía un "patente conflicto en la representación profesional de la parte codemandada U.S.I." (Caso Núm. CE-91-337, Parte I, Anejo A, pág. 6), *por razón de que*, en su opinión, de prevalecer la parte demandante en el pleito "existe, cuando menos, la posibilidad de una *exposición económica personal* del Lcdo. Ledesma y del bufete al cual éste pertenece" —(énfasis suplido) íd.— ante su propio cliente U.S.I. *y ante los restantes codemandados*.([25])

■ Estamos contestes en que, si *efectivamente* existe la *posibilidad* de que un abogado pueda serle *civilmente responsable* a un cliente por actos dimanantes de su actuación como notario al otorgar un documento en que dicho cliente fue parte, definitivamente *existe* un "conflicto de intereses" en dicha situación que impide que dicho abogado notario represente a ese cliente en un pleito en que se cues-

---

([25]) No está en controversia la autoridad de un tribunal de instancia para, en el ejercicio de su poder inherente de supervisar y controlar la conducta de los abogados que postulan en dicho foro, descalificar a aquellos abogados que fallaren en cumplir con su deber de evitar hasta la apariencia de que representan intereses encontrados con los de su cliente. Véase *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 D.P.R. 633 (1988).

Por otro lado, también resultan pertinentes al presente caso las expresiones de este Tribunal sobre los deberes del notario al autorizar una escritura; los cuales, de manera principal, son:

"1. [i]ndagar la voluntad de los otorgantes[;] 2. [f]ormular la voluntad indagada[;] 3. [i]nvestigar ciertos hechos y datos de los que depende la eficacia o validez del negocio[;] 4. [d]arles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo. *Chévere v. Cátala*, 115 D.P.R. 432, 438 (1984). Véase, además, *In re Del Río Rivera y Otero Fernández*, 118 D.P.R. 339, 347 (1987).

tiona la validez del documento otorgado y, en consecuencia, la validez de la actuación del notario.[26]

*¿Es esta la situación en el presente caso?* Veamos.

## IV

■ El Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, en lo pertinente, reza:

El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. *Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.* (Énfasis suplido.)

■ Por otra parte, el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone, en parte y en lo pertinente, que:

El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales, y *debe evitar hasta la apariencia de conducta profesional impropia.* (Énfasis suplido.)

■ Al interpretar las disposiciones del mencionado

---

[26] En cuanto al potencial de responsabilidad civil por actuaciones notariales, este Tribunal ha expresado, en *Chévere v. Cátala*, supra, pág. 437, que dicha responsabilidad:

"... puede desatarse cuando el notario causa un daño a sus clientes: 1. [p]or los defectos formales del instrumento que determinan la frustración del fin perseguido con la intervención notarial[;] 2. [p]or los vicios de fondo que determinen la nulidad absoluta (pues si los hay, el Notario debe abstenerse de intervenir) o la relativa (a menos que esta se produzca por vicio previsto por el Notario y advertido a los otorgantes)[;] 3. [p]or la desacertada elección del medio jurídico para la consecución del fin propuesto[;] 4. [p]or el deficiente asesoramiento en cuanto a las consecuencias del acto notariado (impuestos, retractos, etc.)[, y] 5. [p]or la incorrecta conducta del Notario como depositario o mandatario de sus clientes (pago de impuestos, presentación de documentos, etc.)." (Énfasis suprimido.)

Sobre este tema, en adición, véanse: *In re Cruz Tollinche*, 114 D.P.R. 205 (1983); *In re Raya*, 117 D.P.R. 797 (1986).

Canon 21, en relación al conflicto de intereses personales, este Tribunal ha expresado que

> ... existe un conflicto cuando los intereses personales del abogado imposibilitan la representación adecuada del cliente, chocando con el deber de lealtad hacia éste. En un caso donde se manifiesta este tipo de conflicto el abogado está frente a un dilema: su deber de representar al cliente de manera efectiva puede ser incompatible con la defensa de sus propios intereses. Cuando esto ocurre la representación adecuada conlleva, en la mayoría de los casos, perjudicar los intereses personales del abogado. *In re Belén Trujillo*, 126 D.P.R. 743, 753 (1990).

En consecuencia, es deber de todo abogado asegurarse de que no representa intereses encontrados con los suyos propios y que, en situaciones que presenten conflicto, vendrá en la obligación de renunciar a la representación legal. *In re Roldán González*, 113 D.P.R. 238, 242–243 (1982); *In re Rojas Lugo*, 114 D.P.R. 687, 690 (1983); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 785 (1984). Este Tribunal también ha expresado que, para imponer al abogado la obligación de renunciar a la representación del cliente afectado, el conflicto no tiene que estar establecido claramente; *basta con que el conflicto sea potencial*. La situación *no* varía por el hecho de que alguien crea que dicha posibilidad es, o no, "altamente especulativa". Basta con que el conflicto, repetimos, sea potencial. A esos efectos, en *In re Carreras Rovira y Suárez Zayas*, supra, el Tribunal expresó que:

> No obstante, la conclusión de que un conflicto de intereses existe solamente si surge en el presente una discrepancia entre las posiciones asumidas por los clientes *no es necesariamente inconsistente con el reconocimiento de la existencia de posibles discrepancias teóricas que puedan crear un conflicto de intereses potencial impermisible.* ... El principio de impropiedad ha sido invocado en casos de descalificación sin necesidad de que se aporte prueba de una violación ética. ... De todas formas, *la apariencia de impropiedad será utilizada para resolver cualesquiera dudas que surjan sobre posible conflicto de intereses, en favor de la descalificación.* (Énfasis suplido.) *In re Carreras Rovira y Suárez Zayas*, supra, pág. 792, citando a *In re Valentín*

*González*, 115 D.P.R. 68 (1984), y a *In re Coordinated Pretrial Proceedings, etc.*, [502 F. Supp. 1092, 1099 (D. Cal. 1980)]; reiterado luego en *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 190 (1985).

## V

No podemos perder de vista, sin embargo, que la función notarial es primordialmente una función jurídica, por lo que sólo ha de ejercerse por un jurista instituido. A. Neri, *Tratado teórico y práctico de Derecho Notarial*, Buenos Aires, Ed. Depalma, 1969, Vol. 2, pág. 697. En Puerto Rico esta función está enmarcada dentro de la trayectoria *del notario de tipo latino*, quien es un profesional del Derecho y como tal está revestido del carácter de jurista. Véanse: Art. 2 de la Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2002); *In re Colón Ramery*, supra; *Rosado Collazo v. Registrador*, 118 D.P.R. 577 (1987). Este reconocimiento responde a su cualidad de perito teórico y práctico del Derecho, la cual le asiste como intérprete y asesor de la voluntad humana deseosa de realizaciones jurídicas.

Visto así, *el notario ejerce un doble rol*: de jurista y de magistrado. *Como jurista*, ejerce una función profesional. Es un juez privado de la realidad y regula el derecho de quienes postulan su cometido.[27] *Como magistrado*, ejerce una función pública.[28] En palabras de Neri *op. cit.*, pág. 702: "el derecho razonado privadamente por el jurista se hace efectivo públicamente por el magistrado." En síntesis, "el Notario es el juez de la normalidad, es el encauzador de voluntades por adecuados caminos

---

[27] En la esfera del Derecho, el notario confiere autenticidad y fuerza probatoria a las declaraciones de voluntad de las partes conforme a su juicio sobre los preceptos del ordenamiento jurídico para la validez y eficacia del acto o contrato formalizado, así como sobre la identidad y capacidad de las partes. *In re Colón Muñoz*, 131 D.P.R. 121 (1992).

[28] En la esfera de los hechos, el notario es juez de la exactitud de lo que ve, oye o percibe por sus sentidos. *In re Colón Muñoz*, supra.

jurídicos". P. Malavet Vega, *Manual de Derecho Notarial Puertorriqueño*, Santo Domingo, Ed. Corripio, 1988, pág. 16.

Sin embargo, la función de juzgar la normalidad y sancionar la voluntad de las partes recae, sólo de manera inicial, en el Notario, *cuyo juicio está sujeto a revisión por autoridades judiciales superiores*. En otras palabras, el Notario no confiere "autoridad" a los instrumentos públicos que ante sí se otorgan, sino que meramente los reviste de "autenticidad". Véase R. Núñez Lagos, *Estudios de Derecho Notarial*, Madrid, 1986, T. I, págs. 13–22.

Tampoco debemos perder de vista que el Derecho no es ciencia exacta y que sus "productos", aunque gocen de objetividad, no pueden apreciarse sino a través del ángulo visual de los sujetos encargados de aplicar el Derecho. En vista de ello, debemos coincidir con José Ma. Sanahuja y Soler en que el notario *no* es responsable "por la autorización de un acto que aunque declarado nulo por los tribunales lo ha sido en virtud de un criterio de hermenéutica legal, del cual se puede disentir sin incurrir en ignorancia inexcusable". J.Ma. Sanahuja y Soler, *Tratado de Derecho Notarial*, Barcelona, Ed. Bosch, 1945, T. I, pág. 344. En tales casos, dice Sanahuja y Soler, *op. cit.*, págs. 344–345, *el notario se halla en el mismo caso del juez a quien le han revocado una sentencia.*

Con frecuencia, las controversias jurídicas pueden dar lugar a opiniones doctrinales encontradas. Somos del criterio de que en tales casos, el notario que estudia y fundamenta la selección de alguno de esos criterios cumple con su responsabilidad profesional, *independientemente* de que su interpretación sea luego estimada errónea o equivocada por un tribunal. *En otras palabras* —y no obstante el hecho de que el notario puertorriqueño viene en la obligación de ejercer su misión conforme a las normas de excelencia profesional que el ejercicio del notariado moderno requiere de todo notario— la adopción de un criterio jurídico por parte

de éste, *cuando son dables varias alternativas meritorias*, *no* impone sobre el notario responsabilidad civil por la posterior adopción de un criterio distinto por parte de los tribunales.

    ■   *Resolvemos*, en consecuencia, que un error de juicio en el quehacer notarial *no* da lugar a responsabilidad civil de parte del notario *cuando éste actúa conforme a un juicio informado y honesto, fundado el mismo en un adecuado estudio y en una interpretación razonable de las disposiciones legales vigentes al momento del otorgamiento de la escritura que es luego declarada nula por un tribunal*, véase E. Giménez Arnau, *Derecho Notarial*, 2da ed., Pamplona, Ed. U. Navarra, 1976, pág. 341; Sanahuja, *op. cit.*, págs. 344–345, norma jurisprudencial que este Tribunal consistente y reiteradamente ha aplicado en acciones, por alegada mala práctica profesional, en el campo de la medicina en nuestra jurisdicción. Véanse: *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 309 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820–821 (1987); *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Fernández v. Hosp. Gen. San Carlos, Inc.*, 113 D.P.R. 761, 769 (1983).

    *No* existe, en nuestra opinión, razón jurídica o de cualquier otra índole que impida que este Tribunal establezca, y aplique, dicha *sabia* norma en la esfera de la práctica, y ejercicio, de la Notaría en Puerto Rico. *Somos del criterio que el así hacerlo constituye un acto de justicia, de nuestra parte, para con esos profesionales del Derecho.*

## VI

    ■   Estamos plenamente conscientes del hecho de que la correcta aplicación de la norma, eximente de responsabilidad, del "error de juicio honesto e informado" en el campo de la medicina de ordinario requiere que, a nivel de instancia, el médico demandado por alegada mala práctica

de la medicina demuestre —mediante testimonio pericial y de otra índole— que el curso de acción médica que él siguió era uno razonable y aceptable en la práctica de la medicina en nuestra jurisdicción. Ello, *de ordinario*, igualmente tiene que ser así en cuanto a las acciones de daños y perjuicios que puedan ser radicadas contra un notario por éste alegadamente haber incurrido en conducta causante de daños a una de las partes, en el documento por él otorgado, y/o a terceras personas. *¿Resulta ello necesario en el presente caso?* Somos del criterio que, aun cuando existen indicios de que *efectivamente* se trata de un "error de juicio honesto e informado" eximente de responsabilidad, resulta procedente devolver el asunto al foro de instancia para la celebración de una vista en la cual las partes tendrán la oportunidad de presentar la prueba que a esos efectos entiendan procedente, luego de lo cual el foro de instancia resolverá conforme a derecho. Nos explicamos.

Como surge de la relación de hechos, a U.S.I. le fue negado —por la Junta de Planificación— *todo* uso de un terreno consistente de más de setecientas cincuenta (750) cuerdas. Esto es, *no* se trata de la situación en que la Junta, o el Estado, condiciona un permiso a que *parte* de un terreno sea destinado o utilizado con fines recreativos, para áreas pasivas, etc.; ni siquiera para la preservación de un pájaro, un animal, un insecto, etc. que está en vías de extinción. Se le prohibió a U.S.I., repetimos, *todo* uso de ese terreno. Intentó, *comprensiblemente*, deshacerse del mismo. Dichas gestiones no tuvieron éxito. Seguramente U.S.I. se cuestionó: ¿qué hacer?

Se concibe la idea, entonces, de segregar dichas setecientas cincuenta (750) cuerdas en fincas de veinticinco (25) cuerdas o más, para fines agrícolas, conforme lo dispone el Art. 3 del Reglamento Núm. 3 de la Junta de Planificación. Es correcto que no se había antes utilizado dicha finca para fines agrícolas. Resulta, sin embargo, difícil pensar que una persona o corporación, con la escasez

de tierra que hay en nuestro País, pueda *originalmente* haber considerado dedicar, para fines agrícolas, una finca de tal extensión y valor en lugar de desarrollarla para fines residenciales. *Ahora bien*, ante la imposibilidad de utilizarla para algún otro propósito, ¿resulta irrazonable que se concibiera la idea de lotificarla y venderla en fincas más pequeñas para fines agrícolas?

Es de notar que tanto la escritura mediante la cual se segregó dicha finca, otorgada por el notario Ledesma Vivaldi, así como la escritura aclaratoria que dicho notario otorgara, como las otras escrituras mediante las cuales U.S.I. vendió las "parcelas" de veinticinco (25) cuerdas, para fines agrícolas, a terceras personas, *todas fueron inscritas por el Registrador de la Propiedad correspondiente.*[29] Sabido es que el Art. 64 de la Ley Hipotecaria y del Registro de la Propiedad, Ley Núm. 198 de 8 de agosto de 1979 (30 L.P.R.A. sec. 2267), la cual entró en vigor un *año después*, esto es, el 8 de agosto de 1989, establece que:

> Los registradores calificarán, bajo su responsabilidad la legalidad de los documentos de toda clase en cuya virtud se solicite un asiento. Dicha calificación comprenderá las formas extrínsecas de los documentos presentados, la capacidad de los otorgantes y *la validez de los actos y contratos contenidos en tales documentos*. (Énfasis suplido.)

La función calificadora del Registrador de la Propiedad le impone el deber de determinar *la legalidad* de los documentos presentados y así procurar que exista la máxima paridad entre la realidad registral y la extrarregistral. D. Martínez Irizarry, *Los principios hipotecarios bajo la nueva legislación en Puerto Rico*, 50 Rev. Jur. U.P.R. 195, 213 (1981). En adición, el Art. 68(2) de la

---

[29] Procede que se señale que en algunas de las escrituras que fueron inscritas en el Registro de la Propiedad, relativas las mismas a la venta, por parte de U.S.I., de las "parcelas" de veinticinco (25) cuerdas a terceras personas, claramente se hace referencia a la existencia del pleito radicado por la demandante Federación de Pescadores de la Playa Las Picúas, Inc.

referida Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2271(2), *señala como falta que impide la registración del título presentado aquella que produce la nulidad del mismo.* Es por ello que el Registrador debe considerar como faltas que afectan la legalidad de los documentos presentados, tanto las relativas a sus formas extrínsecas, como las que lo son a la eficacia de las obligaciones contenidas en ellos, siempre que resulten del texto de dichos documentos o puedan conocerse por la simple inspección de ellos. Art. 76.1 del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003-76.1, edición especial; *Mojica Sandoz v. Bayamón Federal Savs.*, 117 D.P.R. 110, 127–128 (1986); *Rosado Collazo v. Registrador*, 118 D.P.R. 577, 582–583 (1987).

En virtud de las referidas disposiciones de la Ley Hipotecaria y del Registro de la Propiedad, el Registrador de la Propiedad viene obligado por el deber ministerial de calificar *la validez y eficacia* de los actos y contratos contenidos en los documentos presentados para inscripción. *Alameda Towers Associates v. Muñoz Román*, 129 D.P.R. 698 (1992); *Rosado Collazo v. Registrador*, supra; *C.R.U.V. v. Registrador*, 117 D.P.R. 662, 664–665 (1986). En el desempeño de esta función calificadora, *el Registrador debe comprobar si el acto jurídico, contenido en la escritura pública presentada, es válido o nulo.* Véase R.M. Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosh, 1979, Vol. II, pág. 270. Esto cobra mayor importancia en vista de que la propia Ley Hipotecaria dispone en su Art. 38 (30 L.P.R.A. sec. 2201) que en el Registro de la Propiedad se inscribirán títulos, actos o contratos, *por lo que la calificación debe recaer sobre la validez de los mismos.* Véase: J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, Madrid, Ed. Cometa, 1981, T. I, pág. 669.[30]

---

[30] Cónsono con la función calificadora del Registrador y en cierto modo paralela, el notario ejerce una previa calificación de la legalidad y suficiencia de los

Por otro lado, el *propio* Tribunal Superior —en la sentencia que emitió el 1ro de noviembre de 1989— *reconoció, o admitió*, que una lectura de las disposiciones del citado Art. 3 del mencionado Reglamento Núm. 3 de Planificación *daba la impresión* de que la exención contenida en el mismo —a los efectos de que se puede segregar bajo esas condiciones *sin* la autorización de la Junta de Planificación— permite hacer lo que hizo U.S.I. y el notario Ledesma Vivaldi. Sólo después *de un acto de interpretación judicial* es que dicho tribunal concluye que dicha segregación no estaba permitida por razón de que la exención del citado Art. 3 es inoperante en relación con fincas localizadas en zonas declaradas inundables.

En tercer término, tenemos que el recurso que en revisión de dicha sentencia radicara U.S.I. ante este Tribunal fue denegado, *pero* con la disidencia de *dos* (2) de sus integrantes. Esto es, dos (2) Jueces de este Tribunal entendieron, *cuando menos*, que la sentencia recurrida debía ser revisada por este Foro. En otras palabras, la corrección de la determinación de nulidad, realizada por el tribunal de instancia, es una que no estaba tan clara en la opinión de algunos de los integrantes del Tribunal.

En resumen, se trata de una actuación notarial que, no obstante la determinación judicial *posterior* en contrario, fue *avalada en distintos momentos* por diferentes juristas o que, cuando menos, éstos entendieron que la determinación judicial declarándola nula no era una obvia y clara. Ello no obstante, y en vista de unos señalamientos —relativos los mismos a una alegada conducta observada por dichos notarios— que han hecho las partes en distintos momentos durante la litigación del presente asunto, consideramos procedente —*dadas las circunstancias particula-*

---

documentos que ha de presentar al Registro de la Propiedad, y debe esforzarse por alcanzar la mayor claridad y certeza en los mismos, para facilitar la labor del Registrador. *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76 (1992); *Empire Life Ins. Co. v. Registrador*, 105 D.P.R. 136, 139 (1976); *Rosado Collazo v. Registrador*, 118 D.P.R. 577 (1987).

*res del presente caso*— devolver el mismo al tribunal de instancia para que éste, antes de continuar adelante con los procedimientos ulteriores pertinentes, celebre inmediatamente una vista y resuelva, a base de la evidencia que tengan a bien presentar las partes, si en el presente caso los abogados notarios pertenecientes a la firma legal Ledesma, Palou y Miranda incurrieron o no, en el presente asunto, en un "error de juicio honesto e informado" —en cuya situación *no sólo* estarían exentos de responsabilidad civil alguna, *sino que* podrían continuar representando a U.S.I. en el pleito por razón de no existir la posibilidad de conflicto alguno de intereses[31]— o, por el contrario, su actuación no puede así ser calificada, en cuya situación procedería decretar su descalificación como abogados de U.S.I. por estar éstos sujetos a la posibilidad de responder civilmente por sus actuaciones.

*Se dictará sentencia de conformidad.*

La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente en parte y disidente en parte. El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Hernández Denton se inhibió.

**– O –**

Opinión concurrente en parte y disidente en parte emitida por la Juez Asociada Señora Naveira de Rodón.

La controversia ante nuestra consideración se limita exclusivamente a la revisión de la determinación del foro de instancia que resolvió que procedía la descalificación del Lcdo. José Ledesma Vivaldi y del bufete al cual éste perte-

---

[31] Ello en vista del hecho de que, de determinarse que el error en que dichos notarios incurrieron fue producto de un error de juicio honesto e informado *ni* U.S.I. *ni* los posteriores compradores de las fincas segregadas tendrían causa de acción alguna, en daños y perjuicios, contra los referidos notarios.

nece, Ledesma, Palou & Miranda, por existir un insalvable conflicto de intereses entre éstos y su cliente, el codemandado U.S. Industries, Inc. (en adelante U.S.I.).([1])

Estamos de acuerdo con la exposición de los hechos que constan tanto en la opinión mayoritaria como en la disidente, aunque no necesariamente con algunas de las caracterizaciones que de éstos se hacen. Sin embargo, por estimarlo indispensable para el análisis que haremos, incluiremos algunos hechos procesales adicionales que surgen de los autos originales del caso, especialmente los que acaecieron con posterioridad a la resolución que hoy nos ocupa. También estamos de acuerdo con la mayoría en que al momento en que se emitió la resolución que descalificó a estos abogados por existir un conflicto de intereses entre ellos y su cliente U.S.I., ésta no procedía. Disentimos de la mayoría en cuanto ésta entra a discutir la defensa afirmativa de "error de juicio honesto e informado" y devuelve el caso para que se celebre "una vista y resuelva, a base de la evidencia que tengan a bien presentar las partes, si en el caso los abogados notarios pertenecientes a la firma legal Ledesma, Palou y Miranda incurrieron o no ... en un 'error de juicio honesto e informado' ...". Opinión mayoritaria, pág. 327.

I

*Hechos adicionales*

El 9 de noviembre de 1990, el foro de instancia celebró una conferencia sobre el estado del caso en la cual el juez le

---

([1]) Luego de la sentencia parcial que determinó.la nulidad de ciertas segregaciones hechas por U.S. Industries, Inc. con relación a los predios en controversia en este caso, donde las escrituras fueron otorgadas ante el licenciado Ledesma Vivaldi, el tribunal resolvió: "[e]stá claro que de prevalecer la posición de los demandantes contra USI, y declararse la nulidad de todas las segregaciones, *existe cuando menos la posibilidad de una exposición económica personal del licenciado Ledesma y del bufete* al cual éste pertenece. Juzgamos que esta posibilidad real o no, pudiera haber contribuido a nublar el juicio profesional de quienes de otro modo, conocemos como abogados serios y responsables." (Énfasis suplido.)

solicitó a las partes que presentaran un memorando en el que discutieran lo siguiente: (1) si todos los titulares eran o no partes indispensables y (2) si la sentencia parcial de 1ro de noviembre de 1989(²) era cosa juzgada oponible a todos los titulares. U.S.I., además, debería someter una lista de todos los titulares. Es importante tener presente que la sentencia parcial se dictó *"exclusivamente* en lo concerniente a los derechos y responsabilidades legales de los demandantes Federación de Pescadores de Playa de Picúa, Inc. y el Estado Libre Asociado de Puerto Rico y [U.S.I.] y Manuel Rivera Torres". (Énfasis suplido.) Surge del expediente que las partes cumplieron con los requerimientos del tribunal. Posteriormente, el 5 de febrero de 1991, el tribunal concedió el permiso y aceptó una demanda enmendada cuyo propósito era incluir como demandados a los compradores de partes alícuotas o condominios de las fincas segregadas.

El 6 de febrero de 1991 el Estado solicitó que se le ordenara al Registrador de la Propiedad, Sección de Carolina, que anotara un aviso de pleito pendiente debido a que las parcelas segregadas habían sido objeto de ventas posteriores, lo que hacía que en el Registro de la Propiedad apareciesen más de doscientas (200) personas con alegados derechos propietarios.

El 22 de abril de 1991, once (11) días después de haberse emitido la resolución que es objeto de este recurso, los demandantes presentaron una segunda demanda enmendada. En ésta cambiaron sustancialmente las alegaciones, añadieron nuevas causas de acción y nuevos demandados. Las categorías de demandados incluidos en la demanda fueron: (1) los dueños de fincas segregadas que no han vendido participaciones proindiviso; (2) los dueños de fincas segregadas que han vendido participaciones y que han creado una comunidad de condueños y lotificacio-

---

(²) De esta sentencia recurrió U.S.I. el 29 de diciembre de 1989 (RE-89-703). El 25 de enero de 1990 denegamos el recurso.

nes de facto; (3) los compradores de partes alícuotas o condominios en las fincas segregadas; (4) U.S.I.; (5) los abogados José Ledesma Vivaldi, Rubén Nigaglioni y Alexis D. Mattei, con sus respectivas esposas y las sociedades de bienes gananciales compuestas por éstos, y (6) el Banco Popular de Puerto Rico como tenedor de una hipoteca sobre una participación pro indivisa en una parcela. La demanda consta de treinta y cuatro (34) páginas y viene acompañada de más de cuarenta y cinco (45) *exhibit.* En términos generales, los demandantes parecen estar alegando que los demandados se pusieron de acuerdo para crear un esquema cuyo propósito e intención era evadir la reglamentación de zonificación aplicable y lograr el acceso al Registro de la Propiedad, y que ésto les causó los daños que reclaman. Solicitaron remedios específicos y daños. Alegaron, además, que la responsabilidad de los demandados era solidaria. Entre las alegaciones hechas contra los abogados Ledesma Vivaldi, Nigaglioni y Mattei está la siguiente:

43. Los notarios codemandados dieron fe pública de que se segregaba la finca para propósitos agrícolas *a sabiendas de que ésto no era la realidad* con la intención de evadir reglamentación de zonificación aplicable y ganar de forma ilegal acceso al Registro de la Propiedad. (Énfasis suplido.)

Luego de esto, varios de los codemandados presentaron unas mociones de prórroga para contestar o alegar, entre las cuales está una en la que, entre otras cosas, se alega:(3)

Recientemente este Honorable Tribunal emitió una Resolución en virtud de la cual ordenó al Lcdo. Rubén Nigaglioni así como al Bufete de Ledesma, Palou y Miranda que se abstuvieran de continuar representando a la codemandada U.S. Industries, Inc. Las razones que adujo el Tribunal se desprenden de

_____

(3) Esta moción fue presentada por los codemandados Waljomar, Inc., Antonio Moreda Toledo y Margarita Alegría y la sociedad de bienes gananciales compuesta por ambos, Margrette Marrero López, Lillian Marrero López, Víctor Hernández Lebrón, Otilia Vincens Vallejo, Jorge Bermúdez Pacheco, Carmen Díaz Gutiérrez y M.T.M. 1078, Inc.

dicha Resolución y por ende no es necesario abundar sobre las mismas. *Sin embargo, ello trastoca el desarrollo procesal del caso pues U.S. Industries por conducto de los referidos abogados llevaban el peso de la defensa de los aquí comparecientes* pues venían obligados de acuerdo al derecho aplicable, a sanear el título de compraventa. Ahora, hemos de esperar quién ha de ser el nuevo *representante legal de U.S. Industries para entonces determinar si estaremos o no satisfechos con dicha representación legal y de no estarlo entonces hacer los reclamos pertinentes de representación legal a dicha codemandada U.S. Industries.* A su vez, la demanda enmendada trae como partes demandadas al pleito a los referidos abogados. *Entonces a la luz de los señalamientos que hizo este honorable tribunal en la Resolución aludida y vista la demanda enmendada incoada nos obliga a estudiar si los aquí comparecientes vienen obligados en este acto a incoar demandas contra copartes o si por el contrario pueden esperar hasta el final del pleito para entonces llevar las acciones de coparte correspondientes.* (Énfasis suplido.)

En los autos originales también aparecen unos emplazamientos no diligenciados, entre los cuales se encuentra uno dirigido al licenciado Ledesma Vivaldi y una nota, de 22 de mayo de 1991, que indicaba que los emplazamientos están pendientes de que se presente una moción que solicitara su expedición. Hay, además, una notificación de toma de deposición para el 21 de mayo de 1991, al licenciado Ledesma Vivaldi presentada por el Estado el 9 de mayo de 1991.

El 6 de junio de 1991 emitimos una orden para que la parte demandante recurrida mostrara causa por la cual no deberíamos revocar la resolución de descalificación y permitir que los abogados descalificados continuasen con la representación legal de U.S.I. en el caso. Ese mismo día también paralizamos los procedimientos en instancia.

## II

*Descalificación por conflicto de intereses*

No nos cabe la menor duda de que en el caso de autos nos confrontamos con una situación distinta a la del caso

*In re Colón Ramery*, 133 D.P.R. 555 (1993). Allí el abogado —notario asumió la representación legal de uno de los partícipes en un negocio jurídico otorgado ante él como notario, en un pleito contencioso instado contra el otro partícipe, que versaba precisamente sobre dicho negocio jurídico. En el caso ante nuestra consideración, unas terceras personas, ajenas al negocio jurídico otorgado ante uno de los abogados-notarios descalificados, traen un pleito, de una parte, contra un único otorgante de un documento —U.S.I., con relación al asunto de la segregación— y de otra parte contra ambos otorgantes —U.S.I. y los compradores de las parcelas segregadas— con relación a las compraventas de dichas parcelas. Todos los codemandados en este caso tenían intereses comunes: sostener la validez de estos negocios jurídicos. Además, el récord refleja, con meridiana claridad, que los demandados, a pesar de haber comparecido con distintas representaciones legales, confiaron el peso de la defensa en los abogados descalificados.

Con respecto al conflicto de intereses entre un abogado y su cliente, hemos tenido la oportunidad de examinar esta figura en varias ocasiones. Hemos resuelto que cuando existe la posibilidad de que se utilicen las confidencias o secretos de un cliente en perjuicio de éste, el abogado no puede obviar la descalificación aduciendo que no las habrá de utilizar. *In re Concepción Suárez*, 111 D.P.R. 486, 491 (1981). En estos casos el perjuicio, tanto para los intereses del cliente como para la imagen de la justicia, resulta obvio. También hemos resuelto que existe un insalvable conflicto de intereses entre el ejercicio de la profesión de abogado ante el Fondo del Seguro del Estado y la Comisión Industrial y el ocupar el puesto de Presidente de la Hermandad Unión de Empleados del Fondo del Seguro del Estado, *In re Rojas Lugo*, 114 D.P.R. 687 (1983); que la lealtad para con un cliente con relación a los asuntos que éste le haya consultado o encargado su representación es indivisible y continúa aun después de cesar las relaciones de

abogado y cliente entre ellos, *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984), y que un abogado no puede defender a una persona en un caso criminal y representarlo como demandado en una reclamación en daños cuando el perjudicado en la causa criminal y demandante en la causa civil era también su cliente en un caso criminal pendiente en trámite apelativo, *In re Rodríguez Torres*, 104 D.P.R. 758 (1976). En todos estos casos las circunstancias tendían a menoscabar la imagen de la justicia, además de perjudicar los intereses del cliente.

El caso ante nuestra consideración presenta una situación distinta. Se trata de un cliente económicamente poderoso y obviamente versado en el mundo de los negocios, que fue asesorado por su abogado en relación, precisamente, con un negocio, y que luego resulta que el negocio jurídico que se lleva a cabo es declarado nulo por un tribunal. El contenido específico del asesoramiento no lo sabemos, pues sobre esto no se ha pasado prueba. Sí sabemos, sin embargo, que el cliente era consciente de los riesgos que entrañaba dicho negocio. Basándose en estos escuetos hechos es que el foro de instancia determina que el abogado podría estar expuesto a una responsabilidad económica frente a su cliente, y que este Foro resuelve que se debe dilucidar la defensa de " 'error de juicio honesto e informado' ". Opinión mayoritaria, pág. 327.

El cliente no ha manifestado que está insatisfecho con el asesoramiento que recibió, que éste fue incorrecto y lo indujo a tomar la decisión de realizar el negocio ni que no fuera consciente de que podrían haber otras interpretaciones relacionadas con el negocio jurídico que podrían conllevar el resultado al cual llegó el tribunal de instancia. Bajo estas circunstancias, resulta altamente especulativo decir que los abogados que asesoraron y otorgaron las escrituras relacionadas con el negocio jurídico podrían serle económicamente responsables al cliente y que, por lo tanto, existe un potencial conflicto de intereses. Además, los hechos de

este caso no presentan una situación como las que hemos confrontado anteriormente, en las que el potencial conflicto de intereses empaña la imagen de la justicia.(4)

Específicamente, y en relación con el alegado conflicto de intereses entre U.S.I. y sus abogados, surge del récord que éstos le habían informado a su cliente de las posibles dificultades que el curso de acción sobre la disposición de los terrenos podría acarrear. En un memorando del Sr. H.D. Wilson, Jr., supervisor de propiedades de U.S.I. en Puerto Rico, de 7 de julio de 1983, dirigido a los miembros del Comité de Inversiones de U.S.I., éste les informó de lo arriesgado que era el negocio jurídico que sobre los terrenos se pensaba realizar. Nada de lo contenido en el récord al momento de la descalificación reflejaba que el asesoramiento recibido por U.S.I. fuera inadecuado. El hecho de que el tribunal declaró nulo el negocio jurídico no implica necesariamente que estos abogados incurrieran en un acto negligente para con U.S.I., y que por lo tanto, existe un posible conflicto de intereses entre éstos y su cliente U.S.I. Del récord surge que éstos gozaban y aparentemente aún gozan de la completa confianza de su cliente. Es precisamente U.S.I. la que comparece ante nosotros a cuestionar la corrección de la descalificación.

Entendemos que en casos de posibles conflictos de intereses entre un abogado y su cliente hay que tomar en consideración, como factor importante al evaluar la procedencia de la descalificación del abogado, los deseos y el interés del cliente que supuestamente es la parte adversamente afectada y la capacidad de dicha parte para juzgar y evaluar lo que más le conviene a la defensa de sus intereses.

---

(4) En *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 D.P.R. 633, 638 (1988), establecimos como "norma en nuestra jurisdicción que los procedimientos de descalificación no constituyen de por sí acciones disciplinarias sujetas a la jurisdicción original y exclusiva de este Tribunal. Los tribunales de primera instancia en el ejercicio de su poder inherente de supervisar y controlar la conducta de los abogados que postulan ante sí, pueden entender y resolver mociones de descalificación de abogados sin menoscabar el poder exclusivo de este Tribunal para entender en acciones disciplinarias contra abogados".

Salvo en los casos en que se afecte adversamente la administración de la justicia o su imagen, el litigante debe tener el derecho de escoger el abogado que lo representará. *In re Vélez*, 103 D.P.R. 590, 599 (1975); *Sánchez Acevedo v. E.L.A.*, 125 D.P.R. 432 (1990). En el caso de autos, la parte demandada es una corporación económicamente poderosa, manejada por hábiles hombres de negocios plenamente capacitados para determinar lo que más le conviene a sus intereses y si éstos están siendo o no bien atendidos.

Al pasar juicio sobre la descalificación de un abogado, los tribunales deben sopesar los intereses que inevitablemente entran en conflicto. De un lado tenemos el efecto adverso que la continuación de la representación legal pueda tener sobre los derechos del cliente, o de cualquiera otra de las partes, a un juicio justo e imparcial y sobre el sistema judicial. De otra parte, tenemos que velar que no se desvirtúe la norma cardinal procesal que encarna la Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, de que todo procedimiento se llevará a cabo de forma justa, rápida y económica, y el derecho de una persona a ser representada por el abogado de su predilección. Al evaluar estos intereses se tomarán en consideración factores tales como el tipo y la gravedad del conflicto de intereses de que se trate; la deseabilidad de que se continúe con la representación legal debido a los conocimientos especializados de ésta sobre el derecho aplicable, o a sus conocimientos sobre los hechos, especialmente cuando éstos son complicados; la etapa de los procedimientos en que surja la controversia sobre la descalificación y su posible efecto en cuanto a la resolución justa, rápida y económica del caso; que la solicitud de descalificación no esté siendo utilizada por la parte contraria como un mecanismo procesal para ganar ventaja, y el posible efecto que sobre el sistema judicial pueda tener la continuación de la representación legal en cuanto a su administración y a la percepción de la justicia por el Pueblo.

En este caso, la demanda se presentó el 12 de septiembre de 1984, hace aproximadamente nueve años y medio (9 1/2). La descalificación surgió seis años y medio (6 1/2) después de haber comenzado el caso y luego de que se hubiese dictado una sentencia parcial. La descalificación se refiere, precisamente, a los abogados responsables del peso de la defensa, los que tienen el mejor conocimiento de los hechos y de las teorías de derecho objeto de la litigación. Sin lugar a dudas, un cambio de abogados en esta etapa del proceso retrasará aún más la solución de la controversia e incrementará el costo del litigio. Se trata de un caso donde hay numerosas partes reclamando y defendiendo derechos distintos que emanan de un negocio jurídico central: la segregación de las treinta (30) parcelas y su posterior venta. En esta etapa de los procedimientos, un cambio de representación legal, especialmente cuando se trata de los abogados de la defensa que están llevando el peso del litigio, cuando el propio cliente no ha manifestado estar inconforme con la labor profesional de estos abogados y cuando el posible conflicto de intereses es altamente especulativo y no afecta adversamente la imagen de la justicia, iría contra los mejores intereses de ésta el conceder la descalificación. El foro de instancia erró al ordenar la descalificación de los abogados de U.S.I.

Esto, sin embargo, no resuelve el problema. Debemos auscultar si los hechos procesales surgidos con posterioridad a la resolución que decretó la descalificación de los abogados de U.S.I. y con anterioridad a la orden de paralización nuestra, cambiaron la situación de tal forma que se hace imperativa la descalificación. Nos estamos refiriendo a la presentación de la segunda demanda enmendada, las posiciones adoptadas por algunos de los codemandados y el aviso de toma de deposición al licenciado Ledesma Vivaldi.

Con relación a la segunda demanda enmendada, no cabe duda de que ésta cambia y amplía sustancialmente las alegaciones y reclamaciones, añadiendo nuevos deman-

dados y causas de acción. Debido a que por orden nuestra el caso se encuentra paralizado, no sabemos ni siquiera si el foro de instancia permitirá o no dicha demanda. La mera presentación de una demanda enmendada, seis años y medio (6 1/2) después de comenzado un pleito, no puede tener el efecto automático de descalificar unos abogados, aun cuando éstos hayan sido incluidos como partes demandadas. Tampoco puede tener este efecto el que se haya presentado un aviso de toma de deposición con relación a dicha demanda enmendada. El tribunal aún no ha decidido si admite o no la demanda enmendada y los nuevos demandados aún no han sido emplazados. Bajo estas circunstancias, cualquier análisis sobre la procedencia o no de una descalificación es prematuro.

## III

### *La defensa de error de juicio honesto e informado*

Disentimos de la mayoría en cuanto a que ésta, para resolver la controversia sobre la descalificación de los abogados de U.S.I., considera necesario que se entre a resolver la controversia sobre la posible responsabilidad de los abogados frente a su cliente U.S.I. Esto lo hace levantando, motu proprio, la defensa afirmativa de "error de juicio honesto e informado".[5]

La mayoría estima que este curso de acción es necesario debido a que el foro de instancia basó su determinación de descalificación en que " 'cuando menos [existe] la posibilidad de una exposición económica personal del Lcdo. Le-

---

[5] Debe tenerse presente que en nuestro sistema de derecho rogado, una defensa afirmativa que no se ha levantado a tiempo por la parte se entiende renunciada. Los tribunales motu proprio no levantan defensas afirmativas, con excepción de aquellas que afectan su jurisdicción para entender en el caso. Reglas 6.3 y 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III; J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1986, Vol. II, págs. 63–65; *Olmeda Nazario v. Sueiro Jiménez*, 123 D.P.R. 294 (1989); *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991), opinión disidente.

desma y del bufete al cual éste pertenece' ...". Opinión mayoritaria, pág. 317. Finalmente, y luego de hacer un análisis de esta defensa afirmativa a la luz de los hechos del caso, concluye que "en vista de unos señalamientos —relativos los mismos a una alegada conducta observada por dichos notarios— que han hecho las partes en distintos momentos durante la litigación del presente asunto, consideramos procedente ... devolver el mismo al tribunal de instancia ...". Íd., pág. 326–27. Se le instruye al foro de instancia que celebre una vista evidenciaria sobre si en el presente caso los abogados notarios pertenecientes a la firma legal Ledesma, Palou y Miranda incurrieron o no en un " 'error de juicio honesto e informado' ". Íd., pág. 327. Razona la mayoría que sólo después de esto es que se podría determinar si procede o no la descalificación, ya que en esos momentos es que se estaría en posición de resolver que los abogados podrían estar sujetos a responder civilmente. En otras palabras, para resolver un incidente sobre descalificación, este Tribunal ha ordenado que dentro de ese caso se resuelva la existencia o no de negligencia, elemento éste esencial en un pleito de daños que aún no se ha presentado. Respetuosamente entendemos que este enfoque está equivocado.

Según expresáramos anteriormente, la posibilidad de que los abogados de U.S.I. le tengan que responder a ésta económicamente es una posibilidad altamente especulativa y poco probable. Ahora bien, independientemente de esto, una moción de descalificación por conflicto de intereses con el cliente no puede hacerse depender de que la posible reclamación de éste contra el abogado prospere o no. La determinación ha de hacerse a base de la posibilidad de que pueda hacerse una reclamación válida. El pleito donde surge la descalificación no es el apropiado para ventilar y resolver una defensa afirmativa que propiamente debe plantearse por la parte demandada en la acción para reclamar daños que posteriormente pueda ins-

tar el cliente contra su abogado. Cabe señalar, además, que para resolver si existe o no la posibilidad de que se presente una reclamación no es necesario que primero se dilucide cualquier defensa afirmativa que la futura parte demandada pueda tener.

Ahora bien, de celebrarse la vista ordenada, como de los autos originales del caso no surge cuál fue el asesoramiento que U.S.I. recibió de sus abogados, hecho este indispensable para que se pueda determinar si hay o no necesidad de levantar la defensa afirmativa de "error de juicio honesto e informado", en la vista en instancia será necesario permitirle a las partes que presenten prueba sobre este hecho.[6] Nos preguntamos a quién le corresponderá el deber de probarlo: ¿A U.S.I., que supuestamente es la parte afectada por el conflicto?; ¿a los codemandados compradores que han adoptado la posición de U.S.I.?; ¿a los demandantes, cuya posición, según ésta surge de la demanda enmendada, es incompatible con una reclamación por impericia profesional? (la alegación de los demandantes es que tanto U.S.I. como sus abogados y los compradores realizaron un negocio jurídico con pleno conocimiento de que éste era ilegal y que, como consecuencia de esto, se les ocasionaron daños), o ¿a los abogados afectados por la determinación de impericia profesional? Éstos aún no son parte en el pleito y tendrían interés en ambos lados de la contienda para demostrar que su asesoramiento fue adecuado y, en la alternativa, que cometieron un "error de juicio honesto e informado".

Estas interrogantes reflejan, con meridiana claridad, que en el potencial caso de reclamación de daños por impericia profesional entre U.S.I. y sus abogados, que este Tribunal está ordenando se dilucide parcialmente dentro del caso actual, realmente no hay partes adversas. Surge de los autos que a U.S.I. no le interesa llevar esta reclamación

---

[6] Nos preguntamos si en preparación para esta vista se permitirá el descubrimiento de prueba y cuán amplio será éste.

y que entiende que no hay conflicto. Esto parece brindarle apoyo a la posición de que estuvo bien asesorado. Sus comparecencias en este recurso y en instancia así lo demuestran. De otra parte, los demandantes sostienen una versión de los hechos incompatible con este tipo de reclamación. Y por último, los compradores parecen apoyar la posición de U.S.I. Parece ser que el único que sostiene una posición contraria es el foro de instancia. Estamos pues, potencialmente, ante un pleito colusorio. Es decir, uno en el que no hay controversias entre las partes y que se presenta para lograr una determinación judicial que sea obligatoria. "[L]os tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas." *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958).

En la alternativa, la orden del Tribunal que devuelve el caso para una vista evidenciaria podría implicar que este Foro implícitamente ha resuelto que el asesoramiento que recibió U.S.I. fue equivocado, ya que sólo así se justifica que se presente prueba exclusivamente sobre la defensa afirmativa de "error de juicio honesto e informado". No sabemos cuál fue ese asesoramiento, y un examen de los autos originales no justifica la conclusión de que U.S.I. fuera mal asesorado por sus abogados. A nuestro entender, la orden que devuelve el caso es improcedente.

Sin pasar juicio sobre la procedencia o no de la defensa afirmativa de "error de juicio honesto e informado", por las razones antes expuestas, disentimos de las partes III y IV de la opinión mayoritaria. Sin embargo, concurrimos con el resultado de que no procede la descalificación de los abogados.

– O –

Opinión disidente del Juez Asociado Señor Negrón García.

"Hoy como siempre el notario se encuentra presionado por los intereses de los poderosos, sea el Estado o los grandes consorcios, que por su gran fuerza política y económica, tratan de doblegar su imparcialidad, situación que se agrava cuando existe relación de dirección y dependencia." B. Pérez del Castillo, *Ética Notarial*, México, Ed. Porrúa, 1985, pág. 33.

Contrario al dictamen mayoritario, debimos confirmar la descalificación del bufete *Ledesma, Palou y Miranda* como abogados de U.S. Industries, Inc. (en adelante U.S.I., Inc.) debido a las segregaciones y compraventas de varias parcelas en "Las Picúas".

El trasfondo fáctico no contradicho, hasta el presente, revela unos indicadores en cuanto a que se planificó y ejecutó un esquema hábil y elaborado para circunvalar la reglamentación gubernamental aplicable a esos terrenos. Expongámoslo.

## I

Originalmente *Las Carmelitas Beach Development Corp.* tomó prestado cuatro millones, setecientos mil dólares ($4,700,000) a la *Caribbean Industrial Credit Corp.*, entidad hermana de la U.S.I., Inc. Otorgó un pagaré hipotecario a favor de Caribbean por esa suma, que vencía el 11 de mayo de 1975, el cual fue garantizado con la finca "Las Picúas".[1] Posteriormente el crédito hipotecario fue cedido a la U.S.I., Inc.

Imposibilitada de cobrar ese préstamo, la acreedora hipotecaria U.S.I., Inc. ejecutó y adquirió el dominio de "Las

---

[1] De la descripción registral de la finca surge que está localizada en el barrio Mameyes del Municipio de Río Grande y que consta de setecientos ochenta y dos cuerdas con setenta y tres centésimas de cuerdas (782.73).

Picúas" el 28 de marzo de 1978 a través de una escritura de venta judicial. El 30 de agosto de 1978, H.D. Wilson, Jr., supervisor de las propiedades de U.S.I., Inc. en Puerto Rico, informó a los funcionarios corporativos que el Departamento de Recursos Naturales había recomendado incluirla en el Plan de Manejo de la zona costanera como parte de una Reserva Natural. Por esta razón, el 3 de noviembre, Wilson, Jr. solicitó al Comité de Inversiones de U.S.I., Inc. que autorizara la creación de un plan de mensura de la finca (*survey plan*) para determinar qué parte era susceptible de ser desarrollada. Posteriormente, varios de sus funcionarios se reunieron con el especialista ambiental Dr. Máximo Cerame-Vivas para recibir asesoramiento. *De la minuta de la reunión surge que se concluyó que parte de la finca era inundable.*

Aún así, U.S.I., Inc. presentó una consulta de ubicación ante la Junta de Planificación para desarrollar un proyecto residencial-turístico. Caso Núm. 80-22-A-142-JPU. El 12 de marzo de 1980 la Junta lo denegó por las siguientes consideraciones:

1. De un análisis exhaustivo de los documentos sometidos, se desprende que hay conflicto entre lo presentado en planos y el someter este proyecto como uno turístico-residencial. En realidad se trata de un proyecto residencial.

2. Los terrenos se encuentran fuera del área delimitada para expansión urbana de Río Grande ...

3. Las facilidades de infraestructura no están disponibles y de desarrollar las que se proponen, serían inadecuadas.

4. *La finca se encuentra dentro de un área inundable: Zona 1 la parte que proponen desarrollar, y Zona 2 el área del manglar, según los Mapas de Zonas Susceptibles a Inundaciones,* Hoja Número 11.

5. *El propuesto proyecto ocasiona impacto en el ambiente, tanto al área de mangle como al área costanera.*

6. ... la fuente de financiamiento que proponen utilizar no es el adecuado para ese tipo de uso [residencial-turístico]. (Énfasis suplido.) Caso Núm. CE-91-337, Parte II, Apéndice, Anejo H, pág. 1.

Ante esta negativa, el referido Comité de Inversiones de

U.S.I., Inc. aprobó de manera unánime el 20 de marzo de 1980 transferir quinientas cuarenta y dos (542) cuerdas de mangles al Departamento de Recursos Naturales, con la condición de recibir todos los permisos de construcción necesarios para desarrollar en el remanente un proyecto de dos mil seiscientas (2,600) unidades de vivienda. Estas negociaciones resultaron infructuosas, ya que el Departamento de Recursos Naturales rechazó la propuesta *por la finca ser inundable.*

Entre tanto, U.S.I., Inc. sometió a la Junta de Planificación *otro* proyecto de construcción, esta vez utilizando el ente corporativo Au Development Company, empresa común *(joint venture)* entre su subsidiaria *U.S. Properties Corp.* y la *April Industries, Inc.* Para lograr su aprobación, el 2 de julio de 1980 los representantes de U.S.I., Inc. hicieron una presentación ante la Junta, expresando que la finca "Las Picúas" *no era inundable.* Por razones obvias, la Junta lo rechazó y se negó a reconsiderar.

El 1ro de julio de 1981, Wilson, Jr. informó al Comité de Inversiones que esperaba una modificación en la posición del Departamento de Recursos Naturales de mantener "Las Picúas" como una reserva natural, puesto que, como resultado de las elecciones generales de 1980, habían surgido cambios en la dirección de ese Departamento. Se proponía hacer otra presentación para lograr una variación en la determinación de mantener gran parte de la finca como reserva natural. Como estrategia, sometería a la Junta un nuevo proyecto de cuatrocientas (400) unidades residenciales, el cual resultaría fútil sin el apoyo de Recursos Naturales. Luego de realizar esa gestión, informó que accedería si recibía una carta de conformidad de la Junta; al no obtenerse, la propuesta nunca se materializó.

Posteriormente, U.S.I., Inc. inició negociaciones para permutar "Las Picúas" por otras fincas del Gobierno. Con este propósito en mente, el 8 de noviembre de 1982 el Lcdo. José A. Ledesma Vivaldi —en representación tanto de

U.S.I., Inc. como de U.S. Properties, Inc.— le cursó una carta personal y confidencial, por mensajero, a la entonces Secretaria del Departamento de Recursos Naturales, Sra. Hilda Díaz Soltero. Esta carta iba acompañada de un documento firmado por Donald L. Alberty, funcionario autorizado de sus clientes, dirigido a concretar la permuta de las fincas con Recursos Naturales y la Autoridad de Terrenos. La permuta jamás se concretó.

Ante la imposibilidad de lograr estas alternativas, el 3 de mayo de 1983 Alberty —representante de U.S.I., Inc. en Puerto Rico— propuso a Wilson, Jr., que la finca "Las Picúas" fuera segregada en lotes de veinticinco (25) cuerdas. El propósito era disponer de la finca sin la Junta de Planificación, pues todas las propuestas previamente presentadas ante dicho organismo habían sido denegadas. El 3 de junio Wilson, Jr. autorizó a Alberty a que consultara al licenciado Ledesma Vivaldi u otras fuentes de autoridad para preparar la descripción registral mínima —lo más sencilla posible— de la finca de forma que, eventualmente, Recursos Naturales no pudiera invocar imperfecciones en la descripción y atacar la segregación. También le pidió que consultara a esas fuentes si, sin mensuras, "era posible segregar basados exclusivamente en una descripción legal". (Traducción nuestra.) Caso Núm. CE-91-337, Pieza II, Apéndice, Anejo V, pág. 1. Se valdrían del Reglamento de Lotificación (Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, ed. rev. 1986) que dispone que para la segregación de una finca en parcelas de veinticinco (25) cuerdas o más, *para fines agrícolas*, no hace falta el permiso de la Junta de Planificación. Mediante un Memorando de 20 de junio, Wilson, Jr. instruyó a Alberty a "[t]rabajar en conjunción con Ledesma para por favor determinar el efecto de la Reglamentación Núm. 17 de la Junta de Planificación 'Reglamento de Zonificación para la Zona Costera y Accesos a las Playas y Costas de

Puerto Rico' ". (Traducción nuestra.) Caso Núm. CE-91-337, Pieza II, Apéndice, Anejo X, pág. 1.

Así se hizo. Alberty otorgó la escritura de segregación el 5 de julio de 1983 ante el notario público Ledesma Vivaldi. Se le asignó un valor de mil dólares ($1,000) a cada una de las treinta (30) parcelas segregadas. Todas estas fueron descritas como "de topografía llana y forma irregular sita en el Barrio Zarzal del Municipio de Río Grande ...". Caso Núm. CE-91-337, Pieza II, Anejo N, Anejo A, pág. 1. Los documentos ante nos reflejan que U.S.I., Inc. conocía acerca de la existencia de los reglamentos que prohibían esa segregación; sin embargo, con el consejo del notario Ledesma Vivaldi, especularon sobre la calificación que el Registrador de la Propiedad pudiera darle a la escritura. En específico, el 7 de julio de 1983 Wilson, Jr., en un memorando a los miembros del Comité de Inversiones de U.S.I., Inc., señaló:

USIPROP *es consciente que bajo la nueva reglamentación que afecta terrenos dentro de una milla de la costa marítima es necesaria la obtención de un permiso de la Junta de Planificación para segregar los terrenos.* La experiencia previa con la Junta de Planificación ha sido muy mala. Aunque a U.S. Industries Properties nunca se le ha denegado permiso para desarrollar la finca, la Junta de Planificación consistentemente ha requerido información adicional sobre la planificación que literalmente la han convertido económicamente prohibitiva.

USIPROP, *al radicar esta segregación como lo ha hecho, está especulando ["gambling"] que el Registrador no tenga conocimiento de las nuevas reglamentaciones y aceptará el plan de segregación de* USIPROP. *Esto es, pura y simplemente, un camino sin salida y las probabilidades de que salgamos exitosos son, en la mejor de situaciones, cincuenta y cincuenta.* Por esta razón, sería prudente establecer una reserva de 50% o $1,115,000 contra el valor neto en los libros de esta propiedad. (Traducción y énfasis nuestros) Caso Núm. CE-91-337, Pieza II, Apéndice, Anejo Z, pág. 2.

Posteriormente, mediante una escritura aclaratoria de 20 de octubre de 1983, el notario Ledesma Vivaldi hizo

constar que por inadvertencia (*due to an inadvertence*) no se había dispuesto, en la escritura de segregación, que las treinta (30) parcelas estaban siendo divididas *para ser dedicadas a propósitos agrícolas, específicamente como una plantación de cocos y pastoreo de ganado* ("to be dedicated for agricultural purposes, specifically as a coconut plantation and for the grazing of cattle"). Caso Núm. CE-91-337, Pieza III, Anejo 1, pág. 3. Se aclaró, además, que el verdadero valor en el mercado de cada parcela era de ochenta mil dólares ($80,000) y, por ende, dos millones cuatrocientos mil dólares ($2,400,000) el de la finca. *De la prueba incontrovertida surge que ni U.S.I., Inc. ni los antecesores en título hubieran dedicado la finca para fines o actividades agrícolas.*

Así segregada, U.S.I., Inc. vendió las treinta (30) parcelas mediante las escrituras públicas correspondientes ante el mismo notario Ledesma Vivaldi y otros notarios del bufete *Ledesma, Palou & Miranda*. En esas escrituras, por primera vez, se menciona que la propiedad se vende como una finca agrícola *no desarrollada*; que está ubicada en la zona inundable de cien (100) años según definida por la Junta de Planificación en su Reglamento sobre Zonas Susceptibles a Inundaciones (Reglamento de Planificación Núm. 13 Junta de Planificación de Puerto Rico, ed. rev. 1987) y en el Programa Nacional de Seguros por Inundaciones; que la propiedad contiene áreas sustanciales de mangles o bajos sujetos a reglamentación federal y local; que podría afectarle la Ley Núm. 1 de 23 de febrero de 1983 (12 L.P.R.A. sec. 401n), declarando el camino o la plaza de utilidad pública a ser expropiado, y que está sujeta al Programa de Manejo de la Zona Costera.

Subsiguientemente, varios de los adquirentes vendieron las cuotas de sus solares a otras personas *sin los permisos de las agencias concernidas*. Como resultado, en violación a la reglamentación aplicable a los terrenos en esta zona, se construyeron edificaciones, se destruyó vegetación y man-

gles —que eran albergues para la vida silvestre— y se removió parte de la corteza terrestre.

El 12 de septiembre de 1984 la Federación de Pescadores de la Playa Las Picúas, Inc. presentó una demanda sobre sentencia declaratoria e *injunction* ante el Tribunal Superior, Sala de Carolina, contra U.S.I., Inc., Manuel Rivera Torres y algunos de los compradores de las parcelas. Desde sus inicios, la representación legal de U.S.I., Inc. en este pleito la ostentó el bufete *Ledesma, Palou y Miranda*. Luego intervinieron el Estado Libre Asociado, la Junta de Planificación, el Departamento de Recursos Naturales y la Administración de Reglamentos y Permisos para alegar la nulidad e ilegalidad de la escritura de segregación y de las subsiguientes compraventas. El 1ro de noviembre de 1989 dicho foro (Hon. Carmen R. Vélez Borrás, Juez) dictó una sentencia en la cual decretó —entre otros pronunciamientos— nulas y carentes de eficacia legal tanto la escritura de segregación como las escrituras de compraventas otorgadas por el notario Ledesma Vivaldi y demás notarios de su bufete. Además, impuso a U.S.I., Inc. el pago de ciento cincuenta mil dólares ($150,000) para el Estado por los daños causados. A tal efecto, en cuanto a la nulidad, concluyó:

3. La anterior declaración de nulidad está fundada, en primer lugar, en el hecho de que, para la fecha en que se realizó la lotificación a la cual hemos hechos referencia, estaba vigente el Reglamento de Planificación Número 13 sobre control de edificaciones y desarrollo de terrenos en zonas susceptibles a inundaciones, complementado por el Mapa de Zonas Susceptibles a Inundaciones. A tenor con las disposiciones de este último, se había identificado el área en el cual ubica la finca objeto de la lotificación como inundable (zona 1).

4. El propio Reglamento, en su sección 6.04 dispone como sigue:

"6.04 Lotificaciones en la Zona 1.—A partir de la fecha de vigencia del correspondiente Mapa de Zona Susceptible a Inundaciones *no se permitirá la lotificación de terrenos en esta Zona.*"

5. Toda vez que la actuación de la demandada U.S. Industries, Inc. al realizar la lotificación de la finca 'Las Picúas' era

una expresamente vedada por el Reglamento Número 13 por estar ubicada la misma esencialmente en una zona 1 identificada como inundable, la nulidad de tal acto resalta a primera vista ya que los actos contrarios a las leyes prohibitivas carecen de validez. Véase, *Rubio Sacarello v. Roig*, 84 D.P.R. 344 (1962); *Corporación Azucarera v. Junta Azucarera*, 77 D.P.R. 397 (1954); *Reyes v. Torres*, 65 D.P.R. 821 (1946).

6. La corporación demandada tampoco podía ampararse en las disposiciones contenidas en el Reglamento de Lotificación Número 3 para inmunizar la lotificación que intentaba realizar de las prohibiciones legales y reglamentarias. Veamos:

En su Artículo 4, el referido Reglamento Número 3 —vigente para la fecha de las lotificaciones— por un lado, exige a toda persona interesada en realizar una lotificación que radique ante el Secretario de la Junta una Declaración de Intención de Lotificar. Por otro lado, el Artículo 3 del citado Reglamento declara exentas de las disposiciones del mismo las lotificaciones de "fincas en la zona rural, para fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas resulte ser de veinticinco cuerdas o mayor."

*A primera vista, una lectura superficial de las disposiciones contenidas en el referido Artículo 3 podría dar la impresión de que la exención a la cual el mismo se refiere comprende todas las fincas radicadas en la zona rural que se dediquen a la actividad agrícola y excedan de 25 cuerdas*, sin importar la naturaleza inundable de las mismas. Sin embargo, el articulado de ambos reglamentos debe ser interpretado de una manera *integrada*. Así lo ordena el párrafo final de prefacio del Reglamento Número 13, el cual reza:

"Las disposiciones de este Reglamento quedarán suplementadas por las disposiciones de cualquier otro reglamento en vigor aprobado por la Junta de Planificación que sea de aplicación para la *zonas específica* en que ubique la propiedad." (Enfasis suplido)

7. Así lo requiere, además, la suma de propósitos que inspiraron la planificación urbana de nuestro país. (Énfasis suplido.) Caso Núm. CE-91-337, Pieza I, Apéndice, Anejo Ch, págs. 16–18.

Concluyó que la ubicación de todas las parcelas en la zona inundable, la existencia sustancial de mangles, el estar sujetas a un camino que sería expropiado y al Programa de Manejo de Zona Costera eran vicios y condiciones "que hacían la compraventa una en contravención a la

ley". Caso Núm. CE-91-337, Pieza I, Apéndice, Anejo Ch, pág. 24.

Las partes afectadas por la sentencia, entre ellas U.S.I., Inc., presentaron sendos recursos de revisión ante este Tribunal; éstos fueron denegados, adviniendo final y firme la sentencia de instancia. *Por ende, hoy día la nulidad de la escritura de segregación y de las posteriores escrituras de compraventa constituye cosa juzgada.*

El pleito prosiguió en cuanto a otros extremos en el mismo Tribunal Superior. Los abogados de U.S.I., Inc., Lcdos. Rubén T. Nigaglioni y José A. Ledesma Vivaldi, suscribieron el 2 de julio de 1990 una moción que solicitaba la recusación de la Juez Vélez Borrás. Luego de una vista, el Hon. Juez Germán Brau la denegó.(²) Después de este incidente, final y firme la sentencia, el Estado pidió su ejecución solicitando que U.S.I., Inc. depositara judicialmente ciento cincuenta mil dólares ($150,000), más intereses, y cinco mil dólares ($5,000) de honorarios de abogado. El 10 de abril de 1991 el tribunal accedió. Además, impuso a U.S.I., Inc. y/o a su representación legal el pago de las costas por una deposición pactada para el 11 de febrero de 1991, a la cual el deponente Alberty no compareció. Condenó a U.S.I., Inc. a pagar cien dólares ($100) de honorarios de abogado a favor de las partes comparecientes a la

---

(²) En su Resolución de 29 de agosto de 1990, págs. 13–14, dicho magistrado señaló que "[d]eploramos las tácticas empleadas por U.S.I. en este caso. Nos preocupan de sobremanera las imputaciones sobre conducta antiética levantadas por los abogados de U.S.I. contra la [J]uez Vélez y la representación de la otra parte. Aunque dichas imputaciones fueron posteriormente recantadas, las mismas claramente trasgreden los límites de la conducta aceptable en un Tribunal de Justicia. El levantar imputaciones de esta índole contra un Magistrado sin el adecuado fundamento es, a su vez, una infracción de las normas de ética de la profesión legal. (Citas omitidas). Esto es conocido por los abogados de U.S.I., según propia admisión contenida en su solicitud. En estas circunstancias, la conducta de los abogados de U.S.I. constituye un peligroso y lamentable precedente que debemos condenar. Estilos como ese simple y sencillamente no pueden tener cabida en nuestro sistema. No obstante lo anterior, y teniendo en cuenta que los abogados de U.S.I. recapacitaron a tiempo sobre su conducta, *nos contentaremos con la presente amonestación, apercibiendo a dichos letrados que en lo futuro conducta de este tipo será severamente sancionada, a tenor con las facultades concedidas a este Tribunal bajo la Regla 9 de Procedimiento Civil.*" (Énfasis suplido.)

Posteriormente, *sua sponte*, la Juez Vélez Borrás se inhibió.

deposición citada. Finalmente, el tribunal descalificó al bufete *Ledesma, Palou y Miranda* como abogados de U.S.I., Inc. En específico dictaminó:

> Cabe recordar que en su sentencia del 1 de noviembre de 1989, la Hon. Juez Vélez Borrás dictaminó la nulidad de ciertas segregaciones realizadas por U.S.I. con relación a los predios en controversia en este caso. Surge de dicha sentencia, así como de los autos de este caso, que dichas segregaciones *fueron realizadas* a través de la *escritura* de segregación número 44 otorgada por U.S.I. el 5 de julio de 1983 *ante el Notario Público Lcdo. José A. Ledesma.* El licenciado Ledesma es *abogado del bufete que representa a U.S.I.* en este caso y es uno de los dos suscribientes de la Moción de Recusación contra la Honorable Juez Vélez Borrás. *Precisamente, la validez de otras segregaciones contenidas en la escritura, otorgada ante el licenciado Ledesma, constituye la médula de las restantes controversias de este caso.*
>
> Esta situación, a nuestro juicio, crea un patente conflicto en la representación profesional de la parte codemandada U.S.I. Está claro que de prevalecer la posición de los demandantes contra U.S.I. y declararse la nulidad de todas las segregaciones, *existe cuando menos la posibilidad de una exposición económica personal* del licenciado Ledesma y del bufete al cual éste pertenece. Juzgamos que esta posibilidad, real o no, pudiera haber contribuido a nublar el juicio profesional de quienes de otro modo conocemos como abogados serios y responsables.
>
> Nuestro Tribunal Supremo ha sostenido reiteradamente que es inapropiado para un abogado el combinar las funciones de Notario y de abogado con relación a un mismo asunto. Véase, *e.g., In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 787 (1984); *B. & L., Inc.* v. *P.R. Cast. Steel Corp.*, 114 D.P.R. 808, 810 (1983); *Pagán* v. *Rivera Burgos*, 113 D.P.R. 750, 752 n. 2 (1983). Por su parte, el Canon 21 de los de Etica Profesional dispone entre otras cosas, que ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales. (Énfasis suplido.) Caso Núm. CE-91-337, Parte I, Apéndice, Anejo A, págs. 6–8.

Contra esta resolución recurrió U.S.I., Inc. vía *certiorari*, y hoy la mayoría del Tribunal revoca.

## II

Este extenso trasfondo fáctico pone de manifiesto clara-
mente que U.S.I., Inc. conocía el carácter inundable de la
finca "Las Picúas", *que no era susceptible para urbanismo
ni clasificable para usos agrícolas.* Ante la negativa reite-
rada de la Junta de Planificación, se vio imposibilitada de
desarrollar varios proyectos de construcción. No pudo ven-
derla ni permutarla; en fin, carecía de alternativas econó-
micamente viables para disponer de la finca. Prestar el
dinero a las Carmelitas Beach Development Corp. garan-
tizando el préstamo con la hipoteca sobre "Las Picúas", le
resultó un mal negocio. El Reglamento Núm. 13 sobre zo-
nas susceptibles a inundaciones, complementado por el
Mapa de Zonas Susceptibles a Inundaciones, identificaba
dicha finca como Zona 1, cuya Sec. 6.04 específica y enfáti-
camente disponía que a partir de su vigencia *"no se
permitir[ía] la lotificación de terrenos en esta zona".* (Énfa-
sis suplido.) Reglamento Núm. 13, *supra*, pág. 41.

*U.S.I., Inc. conocía esta prohibición.* Planificó un inge-
nioso esquema, pero cuestionable, para segregarla —con
una sola "descripción legal" mínima y sencilla— con la es-
peranza de que el Registrador de la Propiedad no conociera
la nueva reglamentación que impedía precisamente dicha
segregación. Así logró segregarla y venderla en parcelas, y
obviar la intervención del Departamento de Recursos Na-
turales y, claro está, la jurisdicción de la Junta de Planifi-
cación, amparándose en el Reglamento Núm. 3 de Planifi-
cación, *supra* —vigente a la fecha de la segregación
realizada— que permitía, sin la necesidad de obtener per-
miso de la Junta, segregar fincas de veinticinco (25) cuer-
das o más *para fines agrícolas.* Ello se hizo con el pleno
conocimiento de que la finca nunca se había dedicado a
fines agrícolas y que estaba situada en una *zona inunda-
ble, no* sujeta a las disposiciones del Reglamento Núm. 3,
*supra. La evidencia en autos hasta ahora tiende a sostener*

*la intervención y consejos notariales directos del bufete Ledesma, Palou y Miranda.*

En resumen, las escrituras de segregación y compraventa fueron los documentos instrumentales de este esquema ilegal, por lo que, acertadamente, el Tribunal Superior y posteriormente este Foro, decretaron su *nulidad.*

## III

La nulidad de todas esas escrituras no se discute. Tampoco que existe una *posible* exposición económica del notario Ledesma Vivaldi y el bufete *Ledesma, Palou y Miranda.* Como expresáramos en *In re Cruz Tollinche,* 114 D.P.R. 205, 207 (1983):

> El abogado en el desempeño de su gestión notarial *está obligado a cumplir con lo dispuesto en la ley, en los [c]ánones de [é]tica o en el contrato entre las partes.* La inobservancia de estos deberes lo expone no sólo a una acción en daños por los perjuicios causados, sino a la jurisdicción correctiva y disciplinaria por parte de este foro judicial. (Énfasis suplido.)

Resulta claramente erróneo configurar por analogía e invocar en *esta etapa* la defensa de error de juicio notarial, la cual hemos permitido exclusivamente en casos de impericia profesional de un médico y únicamente "cuando las autoridades médicas están en desacuerdo sobre cuál es el diagnóstico o tratamiento adecuado". *Ríos Ruiz v. Mark,* 119 D.P.R. 816, 821 (1987). Véanse: *Ramos, Escobales v. García, González,* 134 D.P.R. 969 (1993); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719, 731 (1983). Reiteradamente hemos señalado que "[e]se enfoque, simplemente reconoce la amplia discreción del médico cuando enfrenta una situación en la que cabe duda fundamentada y razonable sobre cuál curso seguir". *Ramos, Escobales v. García, González,* supra, pág. 986, opinión disidente. Véanse: *Lozada v. E.L.A.,* 116 D.P.R. 202, 217 (1985); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 737 (1984); *López v.*

*Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 208 (1978); *Oliveros v. Abréu*, 101 D.P.R. 209, 228 (1973).

*Esa no es la situación en el caso de autos. Primero, hasta el presente* no se ha demostrado la existencia de una diferencia real y sustancial de criterios en la aplicación de los Reglamentos de Planificación pertinentes. Normativamente hablando, no basta ni cabe argumentar la existencia de dos (2) criterios jurídicos respetables y disidentes en este Tribunal (opinión mayoritaria, pág. 326), en cuanto a la sentencia de la Juez Vélez Borrás. Bajo ese enfoque, siempre que hubiera ese tipo de diferencia en casos médicos, ¿estaríamos ante un error de juicio informado?; ¿habría que exonerar automáticamente al médico? No lo creemos. En su esencia la doctrina jurídica se apuntala en la visión de que el desacuerdo médico tiene que ser cualitativo, no cuantitativo.

De la obra de E. Giménez-Arnau reproducimos:

En opinión de Gómez Acebo las causas que pueden dar lugar a responsabilidad por incumplimiento de deber profesional son:

1) Juicio de idoneidad del propio Notario (competencia, ausencia de prohibición legal).

2) Juicio de licitud del acto.

3) Juicio de capacidad.

4) Juicio de legitimación de los otorgantes.

5) Juicio sobre el esquema jurídico más apto para la consecución del resultado querido por los otorgantes.

6) Cumplimiento de los requisitos de redacción y forma, y

7) Cumplimiento de los deberes de información.

Pero para que exista responsabilidad son necesarios estos requisitos:

a) Incumplimiento.

b) Culpabilidad

c) Daño; y

d) Nexo causal

En cuanto a los límites de la responsabilidad de orden civil no existe responsabilidad si la nulidad o ineficacia se deriva de caso fortuito o de culpa en grado no apreciable, es decir que queda excluida la culpa levísima (pero no la ignorancia o negligencia inexcusable).

Tampoco hay responsabilidad si la nulidad deriva de cuestión de derecho controvertida; ni si ha mediado culpa del propio perjudicado.

Consecuencia de todo lo expuesto y del carácter contractual que se atribuye como fundamento de la responsabilidad civil del Notario, es que se considere doctrina común la aplicación de los preceptos de los artículos 1.101 al 1.107 del Código civil. Por ello, si hay buena fe por parte del Notario responderá éste de todos los daños *previstos* o que se hayan podido prever *al tiempo de* constituirse la obligación y que sean *consecuencia necesaria* de su falta de cumplimiento (1.107.1), aunque si "la responsabilidad procede de negligencia, la indemnización podrá *moderarse* por los Tribunales, según los casos" (1.103). Si se actúa con dolo alcanza la reparación a todos los daños y en perjuicios que conocidamente se deriven de la falta de cumplimiento (párrafo 2 del art. 1.107). E. Giménez-Arnau, *Derecho Notarial*, 2da ed., Pamplona, Ed. U. Navarra, 1976, págs. 340–341.

*Segundo*, hay evidencia de que la segregación y descripción de las propiedades se hicieron con el claro y evidente propósito de que el Registrador de la Propiedad, al descargar su función calificadora, no se percatara de las prohibiciones reglamentarias que las impedían. Ante esta realidad, resulta inaplicable esgrimir toda nuestra doctrina en el ámbito del derecho registral y la función calificadora del Registrador de la Propiedad (opinión mayoritaria, págs. 324–325); menos, atribuirle a esa inscripción un valor persuasivo que no tiene (íd., pág. 325).

El notario Ledesma Vivaldi, a nombre de la *fe notarial*, intervino en un esquema que favorecía exclusivamente los intereses de su cliente y subordinaba los del interés general y público. Sabido es que un notario es responsable por sus actos cuando

... causa un daño a sus clientes: 1. por los defectos formales del instrumento que determinan la frustración del fin perseguido con la intervención notarial; 2. por los vicios de fondo que determinen la nulidad absoluta (pues si los hay, el Notario debe abstenerse de intervenir) o la relativa (a menos que ésta se produzca por vicio previsto por el Notario y advertido a los otorgantes); 3. por la desacertada elección del medio jurídico para

la consecución del fin propuesto; 4. por el deficiente asesoramiento en cuanto a las consecuencias del acto notariado (impuestos, retractos, etc.); 5. por la incorrecta conducta del Notario como depositario o mandatario de sus clientes (pago de impuestos, presentación de sus documentos, etc.). (Énfasis suprimido.) *Chévere v. Cátala*, 115 D.P.R. 432, 437 (1984), citando a P. Ávila Álvarez, *Estudios de Derecho Notarial*, 4ta ed., Madrid, Ed. Montecorvo, 1973, págs. 402–403. Véase *In re Cruz Tollinche*, supra.

## IV

Esta situación se proyecta como una posible exposición económica, tanto del notario Ledesma Vivaldi como de los otros abogados, y genera un conflicto de intereses real en este caso. En su petición de *certiorari*, U.S.I., Inc. nos informa que mediante una demanda enmendada se acumularon como demandados a los Lcdos. José A. Ledesma Vivaldi, Rubén T. Nigaglioni y Alexis Mattei, con sus respectivas cónyuges.

El Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone, en lo pertinente:

El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. *Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.* (Énfasis suplido.)

Si el bufete *Ledesma, Palou y Miranda* continuara representando a U.S.I., Inc. en los trámites que restan del litigio, se violaría este Canon ya que no sólo tendrían que defender los intereses de su cliente sino también los suyos en la controversia debido a la nulidad de las escrituras.

Como dijéramos en nuestra opinión de conformidad en *In re Colón Ramery*, 133 D.P.R. 555, 572–573 (1993):

Sabido es que el notario no limita su labor a transcribir los

acuerdos de las partes, sino que orienta y brinda consejos legales. La participación activa comienza en las etapas anteriores del negocio jurídico "en su expresión formal y aún en sus elementos sustantivos", lo cual exige, como requisito fundamental, la observancia de una escrupulosa imparcialidad.

Bajo este prisma, dejar que el notario autorizante asuma el papel de abogado adversativo y reclame judicialmente las contraprestaciones contenidas en el instrumento de su creación —en representación de una de las partes otorgantes contra otra— vulnera el principio de imparcialidad y lo coloca en una situación potencial de conflicto de intereses impermisible. (Énfasis y escolios omitidos.)

El notario Ledesma Vivaldi y otros notarios de su bufete no sólo reconocieron el acto unilateral de segregación, sino las posteriores *escrituras de compraventa; éstas de índole contenciosas.* Al ser nulas las escrituras que autorizaron, no sólo están económicamente expuestos los intereses de su cliente U.S.I., Inc., sino los suyos bajo la alegación de no representar adecuadamente la fe pública notarial. Cualquier otorgante de las treinta (30) escrituras de compraventa que entienda que esa fe pública fue violada y que ello le causó perjuicios en la tenencia de sus títulos sobre las fincas segregadas, podría demandar personalmente a quienes les sirvieron de notarios y/o al bufete como entidad. Además, aun cuando al presente U.S.I., Inc. continúa como su cliente, cabe la posibilidad de que ésta pueda en el futuro también reclamarles.

Ante estas circunstancias, distinto al criterio mayoritario, debimos confirmar la descalificación del bufete *Ledesma, Palou y Miranda* como abogados de U.S.I., Inc.